IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| Willis Towers Watson Southeast, Inc., and Willis Americas Administration, Inc., | Civil No.: 3:23-cv-659 _____ |
| Plaintiffs, | **VERIFIED COMPLAINT** |
| v. | **[JURY TRIAL DEMANDED]** |
| Alliant Insurance Services, Inc., Douglas Pera, John Wyatt, IV, Jessica Laux, Karen Highlander, Timothy Bucheger, Jane Walters, Andrea Kay, and Debbie Johnson, | |
| Defendants. | |

Plaintiffs Willis Towers Watson Southeast, Inc. ("WTW-SE") and Willis Americas Administration, Inc. ("Willis Americas") (collectively, "WTW"),[1] by and through their undersigned counsel, bring this action against Defendants Alliant Insurance Services, Inc. ("Alliant"), Douglas Pera ("Pera"), John Wyatt, IV ("Wyatt"), Jessica Laux ("Laux"), Karen Highlander ("Highlander"), Timothy Bucheger ("Bucheger"), Jane Walters ("Walters"), Andrea Kay ("Kay") and Debbie Johnson ("Johnson"),[2] for preliminary and permanent injunctive relief and damages. WTW states and alleges as follows:

## INTRODUCTION

1.      WTW and Alliant are competing insurance brokers. This lawsuit arises out of Alliant's effort to illegally destroy portions of WTW-SE's Glen Allen-based practice. On

---

[1] Collectively, WTW-SE, Willis Americas, and their parent companies and affiliated entities are sometimes referred to herein as "Willis Towers Watson."

[2] Collectively, Pera, Wyatt, Laux, Highlander, Bucheger, Walters, Kay and Johnson are referred to herein as the "Individual Defendants."

information and belief, in concert with Alliant, several former WTW employees are breaching their valid and reasonable restrictive covenants.

2.      **This is not a non-competition case that seeks to prevent the Individual Defendants from working for a competitor.** Rather, the majority of the Individual Defendants are bound by narrowly tailored restrictive covenants that prevent them from, among other things, soliciting, accepting business from and providing services to clients of WTW-SE, Willis Americas, and their affiliates, with whom the Individual Defendants had contact and/or provided services during their employment.

3.      On information and belief, Pera, who formerly supervised Willis Towers Watson's Southeast Region and went to work for Alliant in August 2023 after allegedly retiring, was directly and/or indirectly involved in encouraging the other Individual Defendants' resignations and encouraging them to go to work for Alliant. Pera was privy to confidential and proprietary information concerning Willis Towers Watson's business in the Southeast Region at the highest levels, including compensation information and information regarding "books of business."

4.      Following Pera's start at Alliant, the first of the Former Employees to resign was Kay, who resigned from her position at WTW-SE on August 4, 2023. On information and belief, Kay began working for Alliant as a Senior Vice President in September 2023.

5.      With Pera and Kay onboard, Alliant's scheme broadened, and Alliant and the Individual Defendants conspired to orchestrate a mass departure in late-September of 2023.

6.      Specifically, on September 18, 2022, Bucheger resigned to work for Alliant without fulfilling his notice obligations. On September 21, 2023, Wyatt resigned, effective immediately. Laux and Highlander resigned, likewise effective immediately, the next day on September 22, 2023. Walters and Johnson resigned their employment shortly thereafter on October 4, 2023,

having remained in place until the business was ready to be stolen. Wyatt, Laux, Highlander, Bucheger, Walters and Johnson left their WTW employment in orchestrated fashion to work for Alliant. By their immediate resignations, Wyatt, Laux, Bucheger and Walters failed to comply with their contractual notice obligations.[3]

7.      Alliant's coordinated raid on WTW-SE's Glen Allen office and Real Estate practice is not an accident; it is in fact Alliant's *modus operandi* and business plan. Over the course of the past several years, Alliant has raided WTW-SE and other insurance brokers from coast-to-coast using the same playbook by having employees disregard the notice provisions in their agreements, submit their immediate resignations, and begin soliciting the clients and employees of their former employers. This has resulted in Alliant and former employees being sued and enjoined in lawsuit after lawsuit, including lawsuits brought by WTW-SE that alleged a similar pattern of conduct. WTW-SE and other insurance brokers have successfully enjoined both former employees and Alliant from carrying out this unlawful behavior. Indeed, Pera is well aware of lawsuits involving Alliant, as during his employment he led the charge to enforce WTW's agreements by way of injunctive relief, often supplying the critical affidavits to demonstrate irreparable harm.

8.      WTW brings this action seeking temporary, preliminary and permanent injunctive relief to maintain the status quo and to prevent the Individual Defendants from continuing to breach their restrictive covenants and other legal obligations by unlawfully soliciting, accepting business from and providing services to WTW clients and prospects, and soliciting WTW employees. WTW also seeks to enjoin Alliant from tortiously interfering with WTW's contractual rights.

---

[3] Highlander also did not provide any advance notice before resigning her position; however, she had no such contractual notice obligation.

9.     In the absence of immediate injunctive relief to maintain the status quo, WTW will suffer immediate, devasting and irreparable harm due to the loss of customers and goodwill, caused entirely by the unfair business practices of Defendants.

## PARTIES

10.     WTW-SE is a Tennessee corporation with its principal place of business located at 26 Century Blvd., Nashville, Tennessee 37214. WTW-SE is the successor in interest to Willis of Virginia, Inc. and Hilb Rogal & Hobbs of Virginia, Inc. f/k/a Hilb, Rogal and Hamilton Company of Virginia ("HRH"). HRH changed its name to Willis of Virginia, Inc., effective January 1, 2000, and Willis of Virginia, Inc. merged into Willis Towers Watson Southeast, Inc., effective December 31, 2019.

11.     Willis Americas is a Tennessee corporation with its principal place of business located at 26 Century Blvd., Nashville, Tennessee 37214.

12.     Defendant Alliant is a California corporation with a principal place of business located at 1301 Dove Street, Suite 200, Newport Beach, California 92660. Alliant operates offices in Alexandria, Chantilly, McLean, Norfolk and Richmond, Virginia, and it is registered to do business in the Commonwealth of Virginia with a registered office located at 100 Shockoe Slip, Fl 2, Richmond, Virginia 23219. Alliant is a direct competitor of WTW and the Willis Towers Watson companies.

13.     Defendant Pera is a resident of the Commonwealth of Virginia who lives at 605 Joe Brooke Lane, Manakin Sabot, Virginia 23103. Pera commenced employment with Willis Americas on or around April 17, 2009. In connection with the start of his employment, he executed an Employment Agreement effective April 17, 2009, a true and correct copy of which is attached as **Exhibit A**. Until his departure, effective December 30, 2022, Pera's title was Corporate and

Risk and Broking Leader for the Southeast Region, assigned to the Glen Allen office. In connection with his retirement, Pera entered into a Separation Agreement with Willis Americas dated August 15, 2022, and effective December 30, 2022 (the "Separation Agreement"), a true and correct copy of the Separation Agreement is attached as **Exhibit B**. At the time of his retirement, Pera was the ultimate supervisor of the other Individual Defendants. In early September 2023, WTW learned from trade publications and social media (specifically, LinkedIn) that Pera had not retired, but had accepted employment at Alliant, a direct competitor of WTW.

14.     Defendant Wyatt is a resident of the Commonwealth of Virginia who lives at 103 Gun Club Road, Richmond, Virginia 23221. Wyatt commenced employment with HRH in 1988. In connection with his HRH employment, Wyatt executed agreements, including a Producer's Employment Agreement dated January 1991, a true and correct copy of which is attached as **Exhibit C**. On September 21, 2023, Wyatt announced his resignation from WTW-SE, effective immediately. At the time of his resignation, Wyatt's title was Senior Director – New Business at WTW-SE, assigned to the Glen Allen office. Wyatt is now an Alliant employee in violation of his contractual notice period. Prior to December 30, 2022, Wyatt ultimately reported to Pera.

15.     Defendant Laux is an individual and, on information and belief, a resident of the Commonwealth of Virginia who lives at 4941 Saddlebridge Court, Glen Allen, Virginia 23221. Laux commenced employment with HRH in November 2008 and signed a Nonpiracy and Nondisclosure Agreement dated November 17, 2008 in connection with same. In connection with accepting a new role, Laux subsequently executed an offer letter containing a Confidentiality and Non-Solicitation Agreement dated November 19, 2020, a true and correct copy of which is attached as **Exhibit D**. Laux was thereafter transferred to WTW-SE. On November 1, 2021, Laux entered into a Confidential Retention Agreement with WTW-SE for which she was paid $33,600,

a true and correct copy of which is attached as **Exhibit E**. On September 22, 2023, Laux announced her resignation from WTW-SE, effective immediately. At the time of her termination, Laux's title was Director – Client Service and Delivery at WTW-SE, assigned to the Glen Allen office. Laux is now an Alliant employee in violation of her contractual notice period. Prior to December 30, 2022, Laux ultimately reported to Pera.

16.     Defendant Highlander is a resident of the Commonwealth of Virginia who lives at 1016 Belva Court, Glen Allen, Virginia 23059. Highlander commenced employment with HRH on or about July 23, 1999. In connection with the commencement of her employment, Highlander executed a Nonpiracy and Nondisclosure Agreement, a true and correct copy of which is attached as **Exhibit F**. On November 1, 2021, Highlander entered into a Confidential Retention Agreement with WTW-SE for which she was paid $93,313, a true and correct copy of which is attached as **Exhibit G**. On September 22, 2023, Highlander announced her resignation from WTW-SE, effective immediately. At the time of her resignation, Highlander's title was Director – Client Service and Delivery at WTW-SE, assigned to the Glen Allen office. Highlander is now an Alliant employee. Prior to December 30, 2022, Highlander ultimately reported to Pera.

17.     Defendant Bucheger is a resident of the Commonwealth of Virginia who lives at 14806 Creekbrook Place, Midlothian, Virginia 23113. Bucheger commenced employment with Willis of Virginia, Inc. in or around July 2011. As a condition to the receipt of a raise, Bucheger executed a Confidentiality and Non-Solicitation Agreement with Willis Americas effective April 1, 2021, a true and correct copy of which is attached as **Exhibit H**. Bucheger resigned, effective immediately, on September 18, 2023, after having served only a few days of a contractually required resignation notice period. At the time of his resignation, Bucheger's title was Associate Director, Broking for Willis Americas, assigned to the Glen Allen office. Bucheger is now an

Alliant employee in violation of his contractual notice period. Prior to December 30, 2022, Bucheger ultimately reported to Pera.

18.     Defendant Walters is a resident of the Commonwealth of Virginia who lives at 506 W. Carolina Avenue, Crewe, Virginia 23930. Walters commenced employment with WTW-SE on or about June 21, 2021. In connection with accepting employment with WTW-SE, Walters executed an offer letter containing a Confidentiality and Non-Solicitation Agreement dated May 28, 2021, a true and correct copy of which is attached as **Exhibit I**. On October 4, 2023, Walters announced her resignation from WTW-SE, effective immediately. At the time of her resignation, Highlander's title was Client Manager for the Real Estate, Hospitality & Leisure practice at WTW-SE, assigned to the Glen Allen office. Walters is now an Alliant employee. Prior to December 30, 2022, Walters ultimately reported to Pera.

19.     Defendant Kay is a resident of the State of Maryland who lives at 11039 Cedarwood Drive, North Bethesda, Maryland 20852. Kay commenced employment with a predecessor of WTW-SE in or about March 2000, and her employment was ultimately assigned to WTW-SE since at least 2022. In connection with a job related action at WTW-SE in March 2022, Kay executed a Confidentiality and Non-Solicitation Agreement made effective on April 1, 2022, a true and correct copy of which is attached as **Exhibit J**. On August 4, 2023, Kay announced her resignation from WTW-SE. At the time of her resignation, Kay's title was Associate Director – P&C Broking for the Real Estate, Hospitality & Leisure practice at WTW-SE, assigned to the Potomac, Maryland office. Kay is now an Alliant employee. Prior to December 30, 2022, Kay ultimately reported to Pera.

20.     Defendant Johnson is a resident of the Commonwealth of Virginia who lives at 2516 Manakin Road, Manakin Sabot, Virginia 23103. Johnson commenced employment with a

predecessor of WTW-SE on or about November 17, 2003. As of at least 2022, Johnson was employed by WTW-SE with the title Lead Associate – Client Service and Delivery. On October 4, 2023, Johnson announced her resignation from WTW-SE, and on information belief, is currently employed by Alliant. Prior to December 30, 2022, Johnson ultimately reported to Pera.

## JURISDICTION AND VENUE

21.     This Court has personal jurisdiction over Alliant because Alliant does business in Virginia and has sufficient minimum contacts with the Commonwealth to have established specific personal jurisdiction, and because Alliant committed acts complained of in this Verified Complaint purposely causing injury to WTW in Virginia.

22.     This Court has general personal jurisdiction over Pera, Wyatt, Laux, Highlander, Bucheger, Walters and Johnson because each is a resident of the Commonwealth of Virginia, and further has specific personal jurisdiction over each of them because each committed acts complained of in this Verified Complaint, in whole or in part, in the Commonwealth of Virginia and/or purposely causing injury to WTW in Virginia.

23.     This Court has personal jurisdiction over Kay because Kay regularly does business in Virginia and has sufficient minimum contacts with the Commonwealth to have established personal jurisdiction, and because Kay committed acts complained of in this Verified Complaint, purposely causing injury to WTW in Virginia.

24.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a) because it is an action between citizens of different states, and the amount in controversy exceeds $75,000. Specifically, WTW-SE and Willis Americas are citizens of Tennessee; Alliant is a citizen of California; Pera, Wyatt, Laux, Highlander, Bucheger, Walters and Johnson are citizens of Virginia; and Kay is a citizen of Maryland.

25.     This Court further has subject matter jurisdiction over its federal claim against Johnson (Count Nine) pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over all other pendent claims pursuant to 28 U.S.C. § 1367.

26.     Venue is appropriate in this judicial District pursuant to 28 U.S.C. § 1391 because multiple of the Individual Defendants reside in this District and Division, and because a substantial part of the events giving rise to the claims occurred in this District and Division.

## FACTUAL ALLEGATIONS

**A.      The Insurance Brokerage Business.**

27.     Plaintiffs are insurance brokers and consultants providing a variety of insurance brokerage and related financial services to corporate clients in Virginia and around the country, including a suite of services to support clients involved in real estate, risk management, consulting and many other services for various industries.

28.     An insurance broker acts as an intermediary on behalf of its clients to broker insurance policies and programs with insurance companies in the United States and around the world. Insurance brokers, including WTW-SE and Alliant, are known as the "broker of record" for their clients. When a client decides to switch brokers, it issues a document known as a "broker of record" letter, or "BOR."

29.     Given the competitive nature of the insurance brokerage industry, WTW and affiliates invest a significant amount of time, money and resources developing and nurturing their client base and identifying the needs and preferences of clients. The information gathered through WTW employees has been compiled over many years at significant expense.

30.     While they were employed at WTW, the Individual Defendants' duties and responsibilities included, among other things, earning new business and sustaining and servicing

existing client relationships. This includes clients in the real estate industry, for whom Individual Defendants provided core brokerage and consulting services, including renewal and placement activities. To accomplish these duties, they were provided and gained extensive access to confidential and proprietary information about WTW clients and prospective clients.

31.     Pera was involved in several senior roles relating to production, segment and geographic leadership, and strategy development during his time at Willis Americas. He ultimately became Corporate and Risk and Broking Leader for the Southeast Region, overseeing over 700 risk and insurance professionals, and was responsible for all aspects of Willis Towers Watson's retail insurance brokerage operations in Alabama, Tennessee, Washington D.C., Virginia, Maryland, North and South Carolina, Georgia and Florida. In connection with that role, Pera was provided and gained access to a wealth of confidential and proprietary information about WTW and its operations, services, lines of business, forecasts, modeling and business plans, clients, prospective clients, employees and virtually every other aspect of WTW's business. As a supervisor with so many individuals under his umbrella, he also developed significant goodwill with WTW employees, and he possessed confidential information relating to their compensation, incentive compensation and books of business.

32.     Wyatt, Laux, Highlander, Walters and Johnson were all client-facing business producers for WTW, and together they were responsible for managing approximately $4.2 million worth of business. It was expected that each would develop relationships with clients in their market, thus giving them unique insight to the client base and the preferences of individual clients, as well as confidential information relating to schedules and types of insurance, rates, markets and locations, negotiations, analyses, forecasts, modeling and so forth, all adding a heightened risk to the business should they leave and move to a competitor. Bucheger and Kay assisted in developing

and servicing a client base in their capacities as brokers as well, where they interacted with the insurance market on behalf of such clients. Walters and Johnson were involved in servicing the team's book of business.

33.     To ensure the Individual Defendants' success, WTW and the Willis Towers Watson companies provided the resources necessary for the Individual Defendants to do their jobs and develop and nurture client relationships with existing, new and prospective clients. These resources included office space, marketing support, expense accounts, computer systems, subject matter experts, proprietary processes, products and organizational structure, research, and administrative and clerical support, all of which were provided at significant expense to WTW and the Willis Towers Watson companies.

34.     The Individual Defendants also benefitted from advertising, goodwill, name recognition, promotional marketing, and sales, administrative and clerical support by WTW and the Willis Towers Watson companies.

35.     The nature of the insurance brokerage business is such that information relating to client and prospective client identities, preferences, risk tolerances, pricing, and other similar issues is extremely valuable. Such information, which allows a company such as WTW to serve its clients, can be used by competitors to entice a client from WTW. This confidential and proprietary information provides WTW with an earned competitive advantage in providing insurance brokerage services at competitive pricing to its clients. To that end, WTW provides extensive research, information, and training in particular areas of specialty so that its employees can meet the needs of clients to develop optimal risk management solutions.

36.     To protect its investments, information, and client relationships from unfair competition and ensure the secrecy of its confidential and proprietary information, WTW takes

reasonable and prudent measures such as requiring employees like the Individual Defendants to execute a variety of agreements which contain confidentiality provisions, non-solicitation provisions and other forms of reasonable restrictive covenants that apply during employment and for a reasonable period of time after employment ends. These types of agreements are common in the industry and, indeed, Alliant utilizes very similar agreements.

## B.     <u>Individual Defendants' Contractual Obligations to WTW.</u>

### (a).     The Pera Agreement.

37.     Pera's Employment Agreement with Willis Americas dated April 17, 2009 (the "Pera Agreement") contains protections relating to confidential information:

> Employer shall provide Employee with access to nonpublic Employer/Willis information to the extent reasonably necessary to the performance of Employee's job duties. Employee acknowledges that all non-public information (including, but not limited to, information regarding Employer's clients), owned or possessed by Employer/Willis (collectively, "Confidential Information") constitutes a valuable, special and unique asset of the business of Employer/Willis. Employee shall not, during or after the period of his/her employment with Employer (i) disclose in whole or in part, such Confidential Information to any third party without the consent of Employer or (ii) use such Confidential Information for his/her own purposes or for the benefit of any third party. . . . Upon termination of Employee's employment hereunder, Employee shall promptly return to Employer all Employer/Willis materials, information and other property (including all files, computer discs and manuals) as may then be in Employee's possession or control.

Ex. A § 2.a.

38.     The Pera Agreement also contains restrictions on the solicitation of customers:

> While this Agreement is in effect and for a period of two years following termination of Employee's employment with Employer, Employee shall not, within the "Territories" described below:
>
> > a. directly or indirectly solicit, accept, or perform, other than on Employer's behalf, insurance brokerage, insurance agency, risk management, claims administration, consulting or other business performed by the Employer/Willis from or with respect to (i) clients of Employer/Willis with whom Employee had business contact or provided services to, either alone or with others, while employed by either Employer or any affiliate of

Employer and, further provided, such clients were clients of Employer/Willis either on the date of termination of Employee's employment with Employer or within twelve (12) months prior to such termination (the "Restricted Clients") and (ii) active prospective clients of Employer/Willis with whom Employee had business contacts regarding the business of the Employer/Willis within six (6) months prior to termination of Employee's employment with Employer (the "Restricted Prospects").

b. **directly or indirectly (i) solicit any employee of Employer/Willis ("Protected Employees") to work for Employee or any third party, including any competitor (whether an individual or a competing company) of Employer/Willis or (ii) induce any such employee of Employer/Willis to leave the employ of Employer/Willis**.

For the purposes of this paragraph 3, "Territories" shall refer to those counties where the Restricted Clients, Restricted Prospects, or Protected Employees of Employer/Willis are present and available for solicitation.

Ex. A § 3 (emphasis added).

39.     In addition to other remedies, including damages, the Pera Agreement provides that Willis Americas may "proceed in equity to enjoin Employee from violating any of the provisions." Ex. A § 7.

40.     The Pera Agreement indicates that, "[i]f any term of this Agreement is rendered invalid or unenforceable by judicial, legislative or administrative action, the remaining provisions hereof shall remain in full force and effect and shall in no way be affected, impaired or invalidated." Ex. A § 7.

41.     The Pera Agreement further provides that it "shall be governed by the law of the state in which Employee is assigned a regular office location by Employer, without giving effect to that state's conflicts of law principles." Ex. A § 7.

42.     Pera's assigned office was in Glen Allen, Virginia.

43.     The laws of the Commonwealth of Virginia law apply to the Pera Agreement.

**(b).     The Wyatt Agreement.**

44.     Wyatt's Richmond Producer's Employment Agreement dated January 1991 (the "Wyatt Agreement") provides for a thirty (30) day notice period prior to the termination of employment:

> Upon the expiration of the Initial Term, this Agreement shall renew for one (1) year terms . . . provided further that during the term of this Agreement either party may terminate this Agreement, with or without cause, upon the giving of thirty (30) days written notice to the other of its intent to do so.

Ex. C § 1.

45.     On September 21, 2023, Wyatt resigned effective immediately without giving his contractually required notice.

46.     The Wyatt Agreement also contains certain restrictive covenants governing his conduct both during and after employment.

47.     For example, the Wyatt Agreement contains a restriction on the use or disclosure of Confidential Information:

> Employee acknowledges that, in the course of his employment hereunder, he will become acquainted and entrusted with certain confidential information  and trade secrets of Employer and the HRH Companies, concerning customers of the HRH Companies ("HRH Customers") and sources with which insurance for such HRH customers is placed, which confidential information includes, but is not limited to, customer lists, financial data and marketing programs of the HRH Companies, policy expiration dates, policy terms, conditions and rates, customers' risk characteristics, and information concerning the insurance markets for large or unusual commercial risks (the "Confidential Information"). Employee agrees that he will safeguard the Confidential Information from exposure to, or appropriation by, unauthorized persons and that he will not, without the prior written consent of Employer or other applicable HRH Company during the term of this Agreement or any time thereafter, divulge or make any use of the Confidential Information except as may be required in the course of his employment hereunder. Upon termination of his employment, Employee promises to deliver to Employer all materials, including personal notes and reproductions relating to the Confidential Information, to the Employer and HRH Companies, to the HRH Business and to the HRH Customers, which are in his possession or control. Employee agrees that compensation and benefits otherwise owing to him may be withheld for failure to comply with the terms of this paragraph.

Ex. C § 4.

48.     The Wyatt Agreement further contains restrictions on the solicitation of customers:

Employee recognizes that over a period of many years the Employer (specifically including for the purposes of this paragraph 5 any predecessors of Employer or entities from which it might have acquired insurance accounts) has developed, at considerable expense, relationships with, and knowledge about, customers and prospective customers which constitute a major part of the value of the Employer. During the course of his employment by Employer, Employee will have substantial contact with these customers and prospective customers. **In order to protect the value of the Employer's business, Employee covenants and agrees that, in the event of the termination of his employment, whether voluntary or involuntary, he shall not directly or indirectly as an owner, stockholder, director, employee, partner, agent, broker, consultant or other participant, for a period of three (3) years from the date of such termination:**

> **(a)      approach, contact or solicit, or continue to allow himself to be approached or contacted by, any individual or firm, which was a Customer (as hereinafter defined), or Prospective Customer (as hereinafter defined) of the Employer, for the purpose of offering, obtaining, selling, diverting or receiving, to or from said individual or firm, services in the field of insurance or any other business engaged in by the Employer during Employee's term of employment;**

> **(b)      approach, contact, or solicit, or continue to allow himself to be approached or contacted by, any individual or firm, which was a Customer or Prospective Customer, of the Employer with whom Employee had personal contact or whose name became known to him in the course of the performance of his employment duties while in the employ of the Employer, for the purpose of offering, obtaining, selling, diverting or receiving, to or from said individual or firm, services in the field of insurance or any other business engaged in by the Employer during Employee's term of employment**;

> (c)      approach, contact or solicit, or continue to allow himself to be approached or contacted by, any individual or firm, which was a Customer or Prospective Customer, of the Employer other than those Customers and Prospective Customers with whom Employee had personal contact while in the employ of Employer, for the purpose of offering, obtaining, selling, diverting or receiving, to or from said individual or firm, services in the field of insurance or any other business engaged in by the Employer during Employee's term of employment; or

> (d)      approach, contact or solicit, or continue to allow himself to be approached or contacted by, any individual or firm:  (i) described above in

subparagraph (a), (b) or (c); and (ii) located within the Restricted Area (as hereinafter defined); for the purpose of offering, obtaining, selling, diverting or receiving, to or from said individual or firm, services in the field of insurance or any other business engaged in by the Employer during Employee's term of employment.

**As used herein, "Customers" shall be limited to those for whom there is insurance coverage in force as of the date of the termination of employment, "Prospective Customers" shall mean those parties who have been solicited by an employee of Employer and have given such Employee an expiration date for all or a portion of their insurance, or have indicated a willingness to allow such employee to quote such insurance at its next renewal or to whom a premium quotation has been conveyed by Employer after a preliminary expression of interest by such party (such solicitation, invitation to bid or expression of interest having been made within twelve (12) months of the date of termination of employment)**; and "Restricted Area" shall mean the city of Richmond, Colonial Heights, Petersburg and Hopewell and the counties of Henrico, Hanover, Goochland, Chesterfield, New Kent and Powhatan, any political subdivision thereof and any independent cities and towns contained within the geographic area of the foregoing counties.

Subparagraphs (a), (b), (c) and (d) are separate and divisible covenants; if for any reason any one covenant is held to be invalid or unenforceable, in whole or in part, the same shall not be held to affect the validity or enforceability of the others, or of any other provision of this Agreement. The periods and scope of the restrictions set forth in said subparagraphs shall be reduced to the maximum permitted by the law actually applied to determine the validity of each subparagraph.

Ex. C § 5 (emphasis added).

49.     The Wyatt Agreement further contains a restriction on the solicitation of employees:

Employee covenants that during his employment hereunder (including renewals) and for an additional period of six (6) months after termination of his employment hereunder for any reason, he will not hire any employees of Employer for work in a business in competition with Employer, nor will he directly or indirectly aid or encourage any of the Employer's employees to seek employment with a business in competition with Employer, whether or not Employee is then affiliated with such competing business.

Ex. C § 6.

50.     In addition to other remedies that might be available for a breach of the contractual obligations contained in the Wyatt Agreement, it provides that the Employer is entitled to injunctive relief, as well as attorneys' fees, for any violation of the restrictive covenants therein. Ex. C §§ 7, 12.

51.     The Wyatt Agreement provides that it "shall be construed under and governed by the laws of the Commonwealth of Virginia."  Ex. C § 14.

52.     The Wyatt Agreement further provides that it "shall inure . . . to the benefit of Employer's respective successors and assigns including, without limitation, successor corporations by way of merger or consolidation or any entity which purchases substantially all of the assets of Employer."  Ex. C § 19.

53.     As successor to HRH, WTW-SE has the legal right and ability to enforce the Wyatt Agreement.

**(c).     The Laux Agreement.**

54.     Laux's Confidentiality and Non-Solicitation Agreement dated November 19, 2020 (the "Laux Agreement") provides that Laux was obligated to give fifteen (15) days' notice prior to terminating her employment:

> Employee's employment with Employer may be terminated . . . by either party, with or without cause, upon fifteen calendar days' prior written notice . . . .

Ex. D § 11.

55.     On September 22, 2023, Laux resigned effective immediately without giving her contractually required notice.

56.     The Laux Agreement also contains certain restrictive covenants governing her conduct both during and after employment.

57.     The Laux Agreement contains covenants relating to the use and disclosure of confidential information:

> A. Employer shall provide Employee with access to Willis Towers Watson's nonpublic confidential, proprietary and trade secret business information including, but not limited to, information relating to its services, products, professional practices, technology, software (including source code and object code), finances, business methodologies and plans, business strategies (including but not limited to marketing strategies and related techniques), prototypes, compositions, improvements, modifications of any kind, clients (including client lists), costs, pricing experimental work, original works of authorship, research and development (collectively "Confidential Information"). Willis Towers Watson Confidential Information is a valuable, special and unique asset and is integral to Willis Towers Watson's business operations and its customer goodwill.
>
> B. Employee shall not use for Employee's own benefit or for the benefit of any third party or disclose to any third party any of Willis Towers Watson's Confidential Information at any time during or after Employee's employment with Employer, except as necessary to perform Employee's duties on behalf of Employer or with express authorization from Employer . . . .
>
> D. Employee shall promptly return to Employer all Willis Towers Watson Confidential Information and materials, information and other property, including but not limited to all documents, papers, records, agreements, notes, memoranda, correspondence, disks, files, electronically stored information, laptop, mobile devices, equipment and any other Willis Towers Watson property in Employee's possession upon termination of Employee's employment.

Ex. D § 2.

58.     The Laux Agreement contains reasonable restrictions on her ability to solicit clients and prospective clients, which provide in part:

> 5. A. Employee acknowledges and agrees that, by reason of Employee's employment, Employee will have access to Confidential Information and will come into contact with clients of Willis towers Watson and will develop and maintain relationships with such clients. Employee further acknowledges that such client relationships have been developed at great expense by Willis Towers Watson. For these and other legitimate business reasons, Willis Towers Watson is entitled to reasonable protection against unfair exploitation, diversion and misappropriation of its client relationships. **Consequently, during Employee's employment (except while acting on Employer's behalf) and for a 24 month period following termination of Employee's employment for whatever reason (voluntary or involuntary), Employee shall not (on Employee's behalf or on behalf of any other person, entity or third party), directly or indirectly:**

**i. Solicit any type of business from clients of Willis Towers Watson which Employee, during the 24 months prior to Employee's cessation of employment with Employer, solicited, had material business contact with, provided services to, and/or for which Employee performed client management activities ("Restricted Clients");**

**ii. Accept any type of business from Restricted Clients;**

**iii. Transact or perform any type of business carried on by Willis Towers Watson for or on behalf of Restricted Clients; or**

iv. Entice Restricted Clients to discontinue, in whole or in part, doing business of any type with Employer or any other Willis Towers Watson company[.]

B. Employee shall not engage in any attempt to circumvent these restrictions through indirect means, including but not limited to, providing information in conjunction with the solicitation of a Restricted Client, including the development of presentations or proposals, attending solicitation presentations to any Restricted Client, and supervising others who are servicing a Restricted Client.

Ex. D § 5 (emphasis added).

59.     The Laux Agreement further restricts Laux's ability to solicit certain prospective

clients. Those provisions provide in part:

A. Employee acknowledges and agrees that, by reason of Employee's employment, Employee will have access to Confidential Information and will come into contact with prospective clients of Willis Towers Watson and will develop and maintain relationships with such prospective clients. Employee further acknowledges that such prospective client relationships have been developed at great expense by Willis Towers Watson. For these and other legitimate business reasons, Willis Towers Watson is entitled to reasonable protections against unfair exploitation, diversion and misappropriation of its prospective client relationships. Consequently, during Employee's employment (except while acting on Employer's behalf) and for a 24 month period following termination of Employee's employment for whatever reason (voluntary or involuntary), Employee shall not (on Employee's behalf or on behalf of any other person, entity or third party), directly or indirectly:

i. Solicit or accept business from any prospective client of Willis Towers Watson with which Employee had material business contact (including, but not limited to, making any presentations regarding any type of business carried on by Willis Towers Watson) within 12 months prior to Employee's termination of employment ("Restricted Prospects"); or

ii. Transact or perform any type of business carried on by Willis Towers Watson for or on behalf of any Restricted Prospects.

B. Employee shall not engage in any attempt to circumvent these restrictions through indirect means, including but not limited to, providing information in conjunction with the solicitation of a Restricted Prospect, including the development of presentations or proposals, and attending solicitation presentations to any Restricted Prospect.

Ex. D § 6.

60.     The Laux Agreement likewise contains restrictions on Laux's ability to solicit

WTW employees:

**During Employee's employment and for a 24 month period following termination of Employee's employment for whatever reason (voluntary or involuntary), Employee shall not (on Employee's behalf or on behalf of any other person, entity or third party), directly or indirectly, hire, entice, induce, encourage, urge or solicit, or attempt to hire, entice, induce, encourage, urge, or solicit any employee to leave employment with a Willis Towers Watson company or become employed by a competitor of Willis Towers Watson. The provisions of this Section 7 shall apply to any employee of a Willis Towers Watson company with whom Employee worked during the 24 months prior to the termination of Employee's employment.**

Ex. D § 7 (emphasis added).

61.     In addition to damages, the Laux Agreement further provides for injunctive relief,

as well as attorneys' fees, in the event of breach of the above restrictive covenants. Ex. D §§ 8, 9.

62.     The Laux Agreement further provides:

If any part of this Agreement is held illegal, invalid or unenforceable by judicial, legislative or administrative action, it will not affect the validity of the remainder of this Agreement and any part held illegal, invalid or unenforceable will not be considered terminated, but will be amended to the extent necessary to make it valid and enforceable. Without limitation to the preceding sentence, if any court finds any covenant set forth in Section 2, 5, 6 or 7 of this Agreement to be unenforceable with regard to scope or duration, the court will modify the covenant to make it enforceable to the maximum extent permitted by law.

Ex. D § 10.

63.     The Laux Agreement provides, "This Agreement, the employment relationship, and the performance of the Parties hereunder shall be governed by the law of the state in which Employee is assigned a regular office location according to the business records of Willis Towers Watson, without giving effect to any conflict or choice of law rules[.]"  Ex. D § 13.

64.     Since Laux was assigned to the Glen Allen, Virginia office, Virginia law applies to the Laux Agreement.

**(d).     The Highlander Agreement.**

65.     Highlander's agreement with HRH dated July 23, 1999 (the "Highlander Agreement") contains obligations relating to the use and disclosure of confidential information:

> Employee acknowledges that, in order for the Employee to effectively perform Employee's duties hereunder, the Company has disclosed and will disclose to the Employee certain confidential business information, and that such confidential business information constitutes valuable, special and unique property of the Company. Accordingly, the Employee hereby agrees that during the term of Employee's employment with the Company, and for a period of three (3) years following termination of such employment, Employee will not divulge, disclose or make accessible to any person or entity (other than as permitted in the regular course of conduct of Employee's duties in performing Company's business) the following confidential business information of the Company:  customer lists; the Company's market plans; the Company's regular, special and excess markets and plans therefor; the expiration of dates of insurance policies written by or through the Company for its customers; sales center techniques; the types of insurance written for such customers and all underwriting, marketing and financial data pertaining thereto; the risk characteristics of such customers; salary information concerning any employees (other than Employee); balance sheet, profit, loss and expense figures for Company and any of its customers or prospective customers; pricing and commission structures for insurance written for, or services provided to, any customers and the names of customers of the Company. Employee acknowledges that, although such information may be replicated partially by obtaining some of such data from the customers or the applicable insurance company, such information can only be replicated through great effort, is highly confidential, and is given to Employee in a fiduciary relationship to both the Company and the customers. Employee agrees, upon termination of Employee's employment, to deliver promptly to the Company all written or other recorded materials (tapes, diskettes, etc.) in Employee's direct or indirect possession or control which contain any such confidential business information and all other property of the Company in Employee's possession or control at such time. In the

event of any breach or threatened breach of this covenant by the Employee, the Company shall be entitled to an injunction restraining such breach, but nothing herein shall be construed as prohibiting the Company from pursuing any other remedy available to it for such breach or threatened breach.

Ex. F § 2.

66.     The Highlander Agreement likewise contains prohibitions on the solicitation of

certain clients:

Employee acknowledges that the Company has expended or will expend significant sums (i) as compensation to Employee and (ii) to enable the Employee to perform the duties incident to Employee's position. Incident to the performance of such duties, Employee will have access to information about Company and its customers and prospects which necessitates the following nonpiracy covenants. **Accordingly, Employee hereby covenants and agrees that, during the period of Employee's employment with the Company and for a period of three (3) years after termination of employment:**

(a)     **Employee will not, in the geographical area contained within a fifty (50) mile radius of the Company office in which the Employee is located (the "Area"), in any way, directly or indirectly, except as an employee of the Company, solicit, divert, take away or accept, or attempt to solicit, divert, take away or accept, the business of any of the customers of the Company which were known by Employee by virtue of Employee's employment to have been customers of Company, or were served or solicited by the Employee for the Company at any time during the term of Employee's employment**, or any prospective customers of the Company which the Employee solicited, or knew to have been solicited by other employees of Company, for the Company within one year prior to the termination of Employee's employment, for the purpose of selling to or servicing for any such customer or prospective customer any product or service which was provided or offered by the Company during Employee's employment (such group of customers and prospective customers, located within and without the Area, hereafter being referred to as "Customers");

(b)     Employee will not, outside the Area, do any of the activities prohibited in (a) with respect to Customers located in the Area ("Area Customers");

(c)     Employee will not, within the Area, directly or indirectly attempt to seek to cause any of the Customers of the Company to refrain from

maintaining or acquiring from or through the Company any product or service which was provided or offered by the Company during Employee's employment, and will not assist any other person or persons to do so;

(d)     Employee will not, outside the Area, do any of the activities prohibited in (c) with respect to Area Customers;

(e)     Employee agrees that in-person contact, telephonic communication or written communication initiated within the Area by or at the request of Employee to any of the Customers shall constitute prohibited activity by the Employee for the purposes of this Agreement;

(f)     Employee will not, outside the Area, do any of the activities prohibited in (e) with respect to Area Customers;

(g)     In the event of any breach or threatened breach of this covenant by the Employee, the Company shall be entitled to an injunction restraining such breach, but nothing herein shall be construed as prohibiting the Company from pursuing any other remedy available to it for such breach or threatened breach.

Ex. F § 1 (emphasis added).

67.     The Highlander Agreement further provides:

Severability; Independence and Reformability of Covenants. Employee agrees that the covenants and agreements contained in this Agreement are of the essence of this Agreement and that each of such covenants is reasonable and necessary to protect and preserve the interests and business of the Company. Additionally, Employee is aware that a claim by Employee of breach of the employment relationship by Company, even if valid, in no way invalidates the covenants contained herein, which shall be enforced as written, or as reformed by a court of competent jurisdiction. Employee further agrees that each of such covenants is independent, separate, distinct and severable not only from the other of such covenants but also from the remaining provisions of this Agreement and that the unenforceability of any such covenant or agreement shall not affect the validity or enforceability of any other such covenant or agreements or any other provisions of this Agreement. Further, Employee and Company specifically request that, should all or any portion of this Agreement be deemed overbroad or as against public policy, the authority before which this Agreement is being construed shall reform this Agreement to reflect the maximum level of enforcement permissible to Company.

Ex. F § 6.

68.　　The Highlander Agreement is governed by the laws of the Commonwealth of Virginia. Ex. F § 4.

69.　　The Highlander Agreement further provides that it "shall inure to the benefit of Company's successors and assigns." Ex. F § 8. WTW-SE is a successor of HRH and thus has the right and ability to enforce the obligations contained in the Highlander Agreement.

**(e).　　The Bucheger Agreement.**

70.　　Bucheger's agreement with Willis Americas effective April 1, 2021 (the "Bucheger Agreement") provides that Bucheger was obligated to give fifteen (15) days' notice prior to terminating his employment:

> Employee's employment with Employer may be terminated (i) by either party, with or without cause, upon fifteen calendar days' prior written notice . . . .

Ex. H § 11.

71.　　On September 15, 2023, Bucheger tendered his resignation. He subsequently accelerated his termination date to September 18, 2023, in violation of his contractual notice period.

72.　　The Bucheger Agreement also contains covenants relating to the use and disclosure of confidential information:

> A. Employer shall provide Employee with access to Willis Towers Watson's nonpublic confidential, proprietary and trade secret business information including, but not limited to, information relating to its services, products, professional practices, technology, software (including source code and object code), finances, business methodologies and plans, business strategies (including but not limited to marketing strategies and related techniques), prototypes, compositions, improvements or modifications of any kind, clients (including client lists), costs, pricing, experimental work, original works of authorship, research and development (collectively "Confidential Information"). Willis Towers Watson Confidential Information is a valuable, special and unique asset and is integral to Willis Towers Watson's business operations and its customer goodwill.

B. Employee shall not use for Employee's own benefit or for the benefit of any third party or disclose to any third party any of Willis Towers Watson's Confidential Information at any time during or after Employee's employment with Employer, except as necessary to perform Employee's duties on behalf of Employer or with express authorization from Employer . . . .

D. Employee shall promptly return to Employer all Willis Towers Watson Confidential Information and materials, information and other property, including but not limited to all documents, papers, records, agreements, notes, memoranda, correspondence, disks, files, electronically stored information, laptop, mobile devices, equipment and any other Willis Towers Watson property in Employee's possession upon termination of Employee's employment.

Ex. H § 2.

73.    The Bucheger Agreement contains reasonable restrictions on his ability to solicit

and service clients, including in part:

A. Employee acknowledges and agrees that, by reason of Employee's employment, Employee will have access to Confidential Information and will come into contact with clients of Willis Towers Watson and will develop and maintain relationships with such clients. Employee further acknowledges that such client relationships have been developed at great expense by Willis Towers Watson. For these and other legitimate business reasons, Willis Towers Watson is entitled to reasonable protection against unfair exploitation, diversion and misappropriation of its client relationships. **Consequently, during Employee's employment (except while acting on Employer's behalf) and for a 24 month period following termination of Employee's employment for whatever reason (voluntary or involuntary), Employee shall not (on Employee's behalf or on behalf of any other person, entity or third party), directly or indirectly:**

i.    **Solicit any type of business from clients of Willis Towers Watson which Employee, during the 24 months prior to Employee's cessation of employment with Employer, solicited, had material business contact with, provided services to, and/or for which Employee performed client management activities ("Restricted Clients");**

ii.    **Accept any type of business from Restricted Clients;**

iii.    **Transact or perform any type of business carried on by Willis Towers Watson for or on behalf of Restricted Clients;** or

iv.    Entice Restricted Clients to discontinue, in whole or in part, doing business of any type with Employer or any other Willis Towers Watson company.

B. Employee shall not engage in any attempt to circumvent these restrictions through indirect means, including but not limited to, providing information in conjunction with the solicitation of a Restricted Client, including the development of presentations or proposals, attending solicitation presentations to any Restricted Client, and supervising others who are servicing a Restricted Client.

Ex. H § 5 (emphasis added).

74.     The Bucheger Agreement further restricts Bucheger's ability to solicit certain prospective clients. Those provisions provide in part:

A. Employee acknowledges and agrees that, by reason of Employee's employment, Employee will have access to Confidential Information and will come into contact with prospective clients of Willis Towers Watson and will develop and maintain relationships with such prospective clients. Employee further acknowledges that such prospective client relationships have been developed at great expense by Willis Towers Watson. For these and other legitimate business reasons, Willis Towers Watson is entitled to reasonable protection against unfair exploitation, diversion and misappropriation of its prospective client relationships. Consequently, during Employee's employment (except while acting on Employer's behalf) and for a 24 month period following termination of Employee's employment for whatever reason (voluntary or involuntary), Employee shall not (on Employee's behalf or on behalf of any other person, entity or third party), directly or indirectly:

i.      Solicit or accept business from any prospective clients of Willis Towers Watson with which Employee had material business contact (including, but not limited to, making any presentations regarding any type of business carried on by Willis Towers Watson) within 12 months prior to Employee's termination of employment ("Restricted Prospects"); or

ii.     Transact or perform any type of business carried on by Willis Towers Watson for or on behalf of any Restricted Prospects.

B. Employee shall not engage in any attempt to circumvent these restrictions through indirect means, including but not limited to, providing information in conjunction with the solicitation of a Restricted Prospect, including the development of presentations or proposals, and attending solicitation presentations to any Restricted Prospect. Nothing in this Section 6, or in this Agreement, prevents Employee from becoming employed with a competitor of Willis Towers Watson following the cessation of Employee's employment with Employer.

Ex. H § 6.

75.     The Bucheger Agreement further contains a prohibition on the solicitation of

employees:

> **During Employee's employment and for a 24 month period following termination of Employee's employment for whatever reason (voluntary or involuntary), Employee shall not (on Employee's behalf or on behalf of any other person, entity or third party), directly or indirectly, hire, entice, induce, encourage, urge, or solicit, or attempt to hire, entice, induce, encourage, urge, or solicit any employee to leave employment with a Willis Towers Watson company or become employed by a competitor of Willis Towers Watson. The provisions in this Section 7 shall apply to any employee of a Willis Towers Watson company with whom Employee worked during the 24 months prior to the termination of Employee's employment.**

Ex. H § 7 (emphasis added).

76.     In addition to damages, the Bucheger Agreement provides for injunctive relief, as

well as attorneys' fees, in the event that Bucheger breaches the above restrictive covenants. Ex. H

§§ 8, 9.

77.     The Bucheger Agreement provides:

> If any part of this Agreement is held illegal, invalid or unenforceable by judicial, legislative or administrative action, it will not affect the validity of the remainder of this Agreement and any part held illegal, invalid or unenforceable will not be considered terminated, but will be amended to the extent necessary to make it valid and enforceable. Without limitation to the preceding sentence, if any court finds any covenant set forth in Sections 2, 5, 6 or 7 of this Agreement to be unenforceable with respect to scope or duration, the court will modify the covenant to make it enforceable to the maximum extent permitted by law.

Ex. H § 10.

78.     The Bucheger Agreement further provides that:    "[t]his Agreement, the

employment relationship, and the performance of the Parties hereunder shall be governed by the

law of the state in which Employee is assigned a regular office location according to the business

records of [WTW], without giving effect to any conflict or choice of law rules. Ex. H § 13.

79.     Since Bucheger was assigned to the Glen Allen, Virginia office, Virginia law applies to the Bucheger Agreement.

**(f).     The Walters Agreement.**

80.     Walters' agreement with WTW-SE dated May 28, 2021 and signed June 2, 2021, (the "Walters Agreement") provides that Walters was obligated to give fifteen (15) days' notice prior to terminating her employment:

> Employee's employment with Employer may be terminated (i) by either party, with or without cause, upon fifteen calendar days' prior written notice . . . .

Ex. I § 11.

81.     On October 4, 2023, Walters tendered her resignation effective immediately, in violation of her contractual notice period.

82.     The Walters Agreement also contains covenants relating to the use and disclosure of confidential information:

> A. Employer shall provide Employee with access to Willis Towers Watson's nonpublic confidential, proprietary and trade secret business information including, but not limited to, information relating to its services, products, professional practices, technology, software (including source code and object code), finances, business methodologies and plans, business strategies (including but not limited to marketing strategies and related techniques), prototypes, compositions, improvements or modifications of any kind, clients (including client lists), costs, pricing, experimental work, original works of authorship, research and development (collectively "Confidential Information"). Willis Towers Watson Confidential Information is a valuable, special and unique asset and is integral to Willis Towers Watson's business operations and its customer goodwill.
>
> B. Employee shall not use for Employee's own benefit or for the benefit of any third party or disclose to any third party any of Willis Towers Watson's Confidential Information at any time during or after Employee's employment with Employer, except as necessary to perform Employee's duties on behalf of Employer or with express authorization from Employer . . . .
>
> D. Employee shall promptly return to Employer all Willis Towers Watson Confidential Information and materials, information and other property, including but not limited to all documents, papers, records, agreements, notes, memoranda,

correspondence, disks, files, electronically stored information, laptop, mobile devices, equipment and any other Willis Towers Watson property in Employee's possession upon termination of Employee's employment.

Ex. I § 2.

83.     The Walters Agreement contains reasonable restrictions on her ability to solicit and service clients, including in part:

A. Employee acknowledges and agrees that, by reason of Employee's employment, Employee will have access to Confidential Information and will come into contact with clients of Willis Towers Watson and will develop and maintain relationships with such clients. Employee further acknowledges that such client relationships have been developed at great expense by Willis Towers Watson. For these and other legitimate business reasons, Willis Towers Watson is entitled to reasonable protection against unfair exploitation, diversion and misappropriation of its client relationships. **Consequently, during Employee's employment (except while acting on Employer's behalf) and for a 24 month period following termination of Employee's employment for whatever reason (voluntary or involuntary), Employee shall not (on Employee's behalf or on behalf of any other person, entity or third party), directly or indirectly:**

**i.      Solicit any type of business from clients of Willis Towers Watson which Employee, during the 24 months prior to Employee's cessation of employment with Employer, solicited, had material business contact with, provided services to, and/or for which Employee performed client management activities ("Restricted Clients");**

**ii.     Accept any type of business from Restricted Clients;**

**iii.    Transact or perform any type of business carried on by Willis Towers Watson for or on behalf of Restricted Clients;** or

iv.     Entice Restricted Clients to discontinue, in whole or in part, doing business of any type with Employer or any other Willis Towers Watson company.

B. Employee shall not engage in any attempt to circumvent these restrictions through indirect means, including but not limited to, providing information in conjunction with the solicitation of a Restricted Client, including the development of presentations or proposals, attending solicitation presentations to any Restricted Client, and supervising others who are servicing a Restricted Client.

Ex. I § 5 (emphasis added).

84.     The Walters Agreement further restricts Walters' ability to solicit certain prospective clients. Those provisions provide in part:

A. Employee acknowledges and agrees that, by reason of Employee's employment, Employee will have access to Confidential Information and will come into contact with prospective clients of Willis Towers Watson and will develop and maintain relationships with such prospective clients. Employee further acknowledges that such prospective client relationships have been developed at great expense by Willis Towers Watson. For these and other legitimate business reasons, Willis Towers Watson is entitled to reasonable protection against unfair exploitation, diversion and misappropriation of its prospective client relationships. Consequently, during Employee's employment (except while acting on Employer's behalf) and for a 24 month period following termination of Employee's employment for whatever reason (voluntary or involuntary), Employee shall not (on Employee's behalf or on behalf of any other person, entity or third party), directly or indirectly:

i.      Solicit or accept business from any prospective clients of Willis Towers Watson with which Employee had material business contact (including, but not limited to, making any presentations regarding any type of business carried on by Willis Towers Watson) within 12 months prior to Employee's termination of employment ("Restricted Prospects"); or

ii.     Transact or perform any type of business carried on by Willis Towers Watson for or on behalf of any Restricted Prospects.

B. Employee shall not engage in any attempt to circumvent these restrictions through indirect means, including but not limited to, providing information in conjunction with the solicitation of a Restricted Prospect, including the development of presentations or proposals, and attending solicitation presentations to any Restricted Prospect. Nothing in this Section 6, or in this Agreement, prevents Employee from becoming employed with a competitor of Willis Towers Watson following the cessation of Employee's employment with Employer.

Ex. I § 6.

85.     The Walters Agreement further contains a prohibition on the solicitation of employees:

**During Employee's employment and for a 24 month period following termination of Employee's employment for whatever reason (voluntary or involuntary), Employee shall not (on Employee's behalf or on behalf of any other person, entity or third party), directly or indirectly, hire, entice, induce, encourage, urge, or solicit, or attempt to hire, entice, induce, encourage, urge,**

> **or solicit any employee to leave employment with a Willis Towers Watson company or become employed by a competitor of Willis Towers Watson. The provisions in this Section 7 shall apply to any employee of a Willis Towers Watson company with whom Employee worked during the 24 months prior to the termination of Employee's employment.**

Ex. I § 7 (emphasis added).

86.     In addition to damages, the Walters Agreement provides for injunctive relief, as well as attorneys' fees, in the event that Walters breaches the above restrictive covenants. Ex. I §§ 8, 9.

87.     The Walters Agreement provides:

> If any part of this Agreement is held illegal, invalid or unenforceable by judicial, legislative or administrative action, it will not affect the validity of the remainder of this Agreement and any part held illegal, invalid or unenforceable will not be considered terminated, but will be amended to the extent necessary to make it valid and enforceable. Without limitation to the preceding sentence, if any court finds any covenant set forth in Sections 2, 5, 6 or 7 of this Agreement to be unenforceable with respect to scope or duration, the court will modify the covenant to make it enforceable to the maximum extent permitted by law.

Ex. I § 10.

88.     The Walters Agreement further provides that: "[t]his Agreement, the employment relationship, and the performance of the Parties hereunder shall be governed by the law of the state in which Employee is assigned a regular office location according to the business records of [WTW], without giving effect to any conflict or choice of law rules. Ex. I § 13.

89.     Since Walters was assigned to the Glen Allen, Virginia office, Virginia law applies to the Walters Agreement.

**(g).     The Kay Agreement.**

90.     Kay's Confidentiality and Non-Solicitation Agreement effective April 1, 2022 (the "Kay Agreement") provides that Kay was obligated to give fifteen (15) days' notice prior to terminating her employment:

> Employee's employment with Employer may be terminated . . . by either party, with or without cause, upon fifteen calendar days' prior written notice . . . .

Ex. J § 11.

91.     On August 4, 2023, Kay resigned effective immediately without giving her contractually required notice.

92.     The Kay Agreement also contains certain restrictive covenants governing her conduct both during and after employment.

93.     The Kay Agreement contains covenants relating to the use and disclosure of confidential information:

> A. Employer shall provide Employee with access to Willis Towers Watson's nonpublic confidential, proprietary and trade secret business information including, but not limited to, information relating to its services, products, professional practices, technology, software (including source code and object code), finances, business methodologies and plans, business strategies (including but not limited to marketing strategies and related techniques), prototypes, compositions, improvements, modifications of any kind, clients (including client lists), costs, pricing experimental work, original works of authorship, research and development (collectively "Confidential Information"). Willis Towers Watson Confidential Information is a valuable, special and unique asset and is integral to Willis Towers Watson's business operations and its customer goodwill.
>
> B. Employee shall not use for Employee's own benefit or for the benefit of any third party or disclose to any third party any of Willis Towers Watson's Confidential Information at any time during or after Employee's employment with Employer, except as necessary to perform Employee's duties on behalf of Employer or with express authorization from Employer . . . .
>
> D. Employee shall promptly return to Employer all Willis Towers Watson Confidential Information and materials, information and other property, including but not limited to all documents, papers, records, agreements, notes, memoranda, correspondence, disks, files, electronically stored information, laptop, mobile devices, equipment and any other Willis Towers Watson property in Employee's possession upon termination of Employee's employment.

Ex. J § 2.

94.     The Kay Agreement contains reasonable restrictions on her ability to solicit clients

and prospective clients, which provide in part:

5. A. Employee acknowledges and agrees that, by reason of Employee's employment, Employee will have access to Confidential Information and will come into contact with clients of Willis towers Watson and will develop and maintain relationships with such clients. Employee further acknowledges that such client relationships have been developed at great expense by Willis Towers Watson. For these and other legitimate business reasons, Willis Towers Watson is entitled to reasonable protection against unfair exploitation, diversion and misappropriation of its client relationships. **Consequently, during Employee's employment (except while acting on Employer's behalf) and for a 24 month period following termination of Employee's employment for whatever reason (voluntary or involuntary), Employee shall not (on Employee's behalf or on behalf of any other person, entity or third party), directly or indirectly:**

**i. Solicit any type of business from clients of Willis Towers Watson which Employee, during the 24 months prior to Employee's cessation of employment with Employer, solicited, had material business contact with, provided services to, and/or for which Employee performed client management activities ("Restricted Clients");**

**ii. Accept any type of business from Restricted Clients;**

**iii. Transact or perform any type of business carried on by Willis Towers Watson for or on behalf of Restricted Clients; or**

iv. Entice Restricted Clients to discontinue, in whole or in part, doing business of any type with Employer or any other Willis Towers Watson company[.]

B. Employee shall not engage in any attempt to circumvent these restrictions through indirect means, including but not limited to, providing information in conjunction with the solicitation of a Restricted Client, including the development of presentations or proposals, attending solicitation presentations to any Restricted Client, and supervising others who are servicing a Restricted Client.

Ex. J § 5 (emphasis added).

95.     The Kay Agreement further restricts Kay's ability to solicit certain prospective

clients. Those provisions provide in part:

A. Employee acknowledges and agrees that, by reason of Employee's employment, Employee will have access to Confidential Information and will come into contact with prospective clients of Willis Towers Watson and will develop and maintain relationships with such prospective clients. Employee further acknowledges that such prospective client relationships have been developed at great expense by

Willis Towers Watson. For these and other legitimate business reasons, Willis Towers Watson is entitled to reasonable protections against unfair exploitation, diversion and misappropriation of its prospective client relationships. Consequently, during Employee's employment (except while acting on Employer's behalf) and for a 24 month period following termination of Employee's employment for whatever reason (voluntary or involuntary), Employee shall not (on Employee's behalf or on behalf of any other person, entity or third party), directly or indirectly:

i. Solicit or accept business from any prospective client of Willis Towers Watson with which Employee had material business contact (including, but not limited to, making any presentations regarding any type of business carried on by Willis Towers Watson) within 12 months prior to Employee's termination of employment ("Restricted Prospects"); or

ii. Transact or perform any type of business carried on by Willis Towers Watson for or on behalf of any Restricted Prospects.

B. Employee shall not engage in any attempt to circumvent these restrictions through indirect means, including but not limited to, providing information in conjunction with the solicitation of a Restricted Prospect, including the development of presentations or proposals, and attending solicitation presentations to any Restricted Prospect.

Ex. J § 6.

96.     The Kay Agreement likewise contains restrictions on Kay's ability to solicit WTW employees:

**During Employee's employment and for a 24 month period following termination of Employee's employment for whatever reason (voluntary or involuntary), Employee shall not (on Employee's behalf or on behalf of any other person, entity or third party), directly or indirectly, hire, entice, induce, encourage, urge or solicit, or attempt to hire, entice, induce, encourage, urge, or solicit any employee to leave employment with a Willis Towers Watson company or become employed by a competitor of Willis Towers Watson. The provisions of this Section 7 shall apply to any employee of a Willis Towers Watson company with whom Employee worked during the 24 months prior to the termination of Employee's employment.**

Ex. J § 7 (emphasis added).

97.     In addition to damages, the Kay Agreement further provides for injunctive relief, as well as attorneys' fees, in the event of breach of the above restrictive covenants. Ex. J §§ 8, 9.

98.     The Kay Agreement further provides:

If any part of this Agreement is held illegal, invalid or unenforceable by judicial, legislative or administrative action, it will not affect the validity of the remainder of this Agreement and any part held illegal, invalid or unenforceable will not be considered terminated, but will be amended to the extent necessary to make it valid and enforceable. Without limitation to the preceding sentence, if any court finds any covenant set forth in Section 2, 5, 6 or 7 of this Agreement to be unenforceable with regard to scope or duration, the court will modify the covenant to make it enforceable to the maximum extent permitted by law.

Ex. J § 10.

99.     The Kay Agreement provides, "This Agreement, the employment relationship, and the performance of the Parties hereunder shall be governed by the law of the state in which Employee is assigned a regular office location according to the business records of Willis Towers Watson, without giving effect to any conflict or choice of law rules[.]" Ex. J § 13.

100.    Since Kay was assigned to the Potomac, Maryland office, Maryland law applies to the Kay Agreement.

101.    Collectively, the Pera Agreement, Wyatt Agreement, Laux Agreement, Highlander Agreement, Bucheger Agreement, Walters Agreement and Kay Agreement are referred to as the "Employment Agreements."

**C.     Pera's Separation of Employment with Willis Americas.**

102.    In connection with Pera's retirement, on or about August 25, 2022, Willis Americas and Pera executed the Pera Separation Agreement. The Pera Separation Agreement (the "Separation Agreement") was effective December 30, 2022.

103.    By that Separation Agreement, Willis Americas agreed that, in exchange for Pera's obligations under the Separation Agreement, it would provide Pera with significant severance benefits that included, among other things:

a. Payment of $441,346 in a lump sum, representing fifty-one (51) weeks of Pera's then-current base salary;

b. Payment of COBRA medical and dental premiums for thirteen (13) months, through January 31, 2024, if Pera elected to continue coverage under the Company Health Care Plan; and

c. Continued eligibility to participate in the Company's annual discretionary short-term incentive bonus program through the end of 2022, with any bonus being paid in March 2023.

104. In exchange for these benefits, Pera agreed to certain restrictive covenants.

105. For example, the Separation Agreement contains a prohibition on soliciting certain clients and prospective clients:

**Non-Solicitation of Clients and Prospects**

**Restricted Clients:**  You acknowledge and agree that, by reason of your past employment with the Company, you have been permitted access to the Company's confidential information regarding, among other things, its clients, as has been developed at great expense by the Company. For this and other legitimate business reasons, the Company is entitled to reasonable protection against unfair exploitation, diversion and misappropriation of its client relationships. Consequently, for a 24-month period following your cessation of employment with the Company, you shall not (on your behalf or on behalf of any other person, entity or third party), directly or indirectly:

i. Solicit any type of business from clients of the Company which you, during the 24 months prior to your cessation of employment with the Company, solicited, had material business contact with, provided services to, and/or for which you performed client management ("Restricted Clients");

ii. Accept any type of business from Restricted Clients;

iii. Transact or perform any type of business carried on by the Company, or for or on behalf of Restricted Clients; or

iv. Entice Restricted Clients to discontinue, in whole or in part, doing business of any type with the Company and/or any of its affiliates.

You shall not engage in any attempt to circumvent these restrictions through indirect means, including but not limited to, providing information in conjunction with the solicitation of a Restricted Client, including the development of

presentations or proposals, attending solicitation presentations to any Restricted Client, and supervising others who are servicing a Restricted Client . . . . Nothing in this section prevents you from becoming employed with a competitor of the Company following the cessation of your employment with the Company.

**Restricted Prospects:** You acknowledge and agree that, by reason of your past employment with the Company, you have been permitted access to the Company's confidential Information regarding, among other things, its prospective clients, as has been developed at great expense by the Company. For this and other legitimate business reasons, the Company is entitled to reasonable protection against unfair exploitation, diversion and misappropriation of its prospective client relationships. Consequently, for a 24-month period following termination of your employment for whatever reason (voluntary or involuntary), you shall not (on your behalf or on behalf of any other person, entity or third party), directly or indirectly:

  i.   Solicit or accept business from any prospective clients of the Company with which you had material business contact (including, but not limited to, making any presentations regarding any type of business carried on by the Company) within 12 months prior to your cessation of employment with the Company ("Restricted Prospects"); or

  ii.  Transact or perform any type of business carried on by the Company for or on behalf of any Restricted Prospects.

You shall not engage in any attempt to circumvent these restrictions through indirect means, including but not limited to, providing information in conjunction with the solicitation of a Restricted Prospect, including the development of presentations or proposals, and attending solicitation presentations to any Restricted Prospect. Nothing in this section, or in this agreement, prevents you from becoming employed with a competitor of the Company following the cessation of your employment with the Company.

Ex. B.

106.   The Separation Agreement contains a two (2) year prohibition against soliciting

Willis employees:

**Non-Solicitation of Employees**

**For a 24-month period following the cessation of your employment with the Company for whatever reason (voluntary or involuntary), you shall not (on your behalf or on behalf of any other person, entity or third party) directly or indirectly hire, entice, induce, encourage, urge, or solicit, or attempt to hire, entice, induce, encourage, urge, or solicit any employee to leave employment**

**of the Company or any of its affiliates or become employed by a competitor of the Company. The provisions in this paragraph shall apply to any employee of the Company and/or its affiliates with whom you worked during the 24 months prior to the cessation of your employment with the Company.**

Ex. B (emphasis added).

107.    The Separation Agreement also contains a return of property provision, which states:

**Return of Company Property**

You shall return as soon as possible on or after your termination date all Company property in your possession, including all originals and copies of confidential and proprietary information, Company credit cards, building keys, computer equipment and software, databases, files, records, client lists, correspondence, work papers and any other materials you may have in your possession or under your control that relate to the business of the Company.

Ex. B.

108.    The Agreement likewise clarifies that any restrictive covenants to which Pera had agreed shall remain in full force and effect:

**Continuing Obligations to Willis Towers Watson**

Following your separation date, you will be expected to comply with any and all continuing obligations you may have to the Company that survive termination of your employment. Please bear such obligations in mind as you pursue your future endeavors. In general, such obligations include:

- Your continuing obligations to the Company under the Willis Towers Watson Code of Conduct.
- Any surviving restrictive covenants contained within any employment agreement, confidentiality agreement or other agreement you may have previously entered into with the Company and/or any of its affiliates. Please review any and all such previously executed agreements for details of any and all such surviving post-employment obligations.

This agreement shall be in addition to, and not in place of, the surviving restrictive covenants contained within any employment agreement, confidentiality agreement and/or other agreement you may have previously entered into with the Company and/or any of its affiliates (such previous agreement, if any, being referred to below as a ("Prior Agreement") . . . .

Ex. B.

109.    The Separation Agreement further provides:

The provisions of this agreement are severable. Should any provision herein be declared invalid by a court of competent jurisdiction, the remainder of the agreement will continue in force; and the parties agree to renegotiate the invalidated provision in good faith to accomplish its objective to the extent permitted by law. This agreement shall be governed by the law of the state in which you are assigned a regular physical office location according to the business records of Willis Towers Watson, without giving effect to any conflict or choice of law rules.

Ex. B.

110.    Pera's assigned office was in Glen Allen, Virginia.

111.    The laws of the Commonwealth of Virginia law apply to the Separation Agreement.

112.    In addition to the benefits Pera received through the Separation Agreement, in reliance on Pera's communication that he was retiring and based on Willis Americas' understanding that Pera would no longer be working, the Willis Towers Watson Share Award Committee (SAC) exercised its discretion to allow two of Pera's long-term incentive awards, relating to a grant of restricted stock units ("RSUs"), to continue vesting on a pro-rated basis.

113.    There was no obligation under the applicable plan and award documents for continued vesting in the event that Pera separated from Willis Americas. The SAC would not have agreed to the continued vesting of Pera's RSUs but for its understanding that Pera was retiring.

114.    On April 1 2023, several months after the effective date of the termination of Pera's Willis Americas employment, a tranche of Pera's RSUs vested.

115.    Little did WTW know, despite its belief that he had retired, Pera would shortly be working in the insurance brokerage industry again, this time for Alliant, a direct competitor.

**D.     <u>Pera Becomes an Alliant Employee and, on Information and Belief, Solicits WTW Employees to Work for Alliant in Violation of the Pera Agreement and Separation Agreement.</u>**

116.    In early September, WTW discovered that Pera had accepted a position at Alliant. According to his LinkedIn profile, Pera is currently serving as Executive Vice President/Director – East Region, and his job responsibilities are "focused on clients and talent by assisting our teams in the East region with clients, adding new talent in the region and helping to deliver growth in this high potential geography." His LinkedIn profile further indicates that he continues to be based in Virginia.

117.    On information and belief, Pera has either directly or indirectly solicited the other Individual Defendants, all of whom were his former colleagues in the Glen Allen office or worked with the Glen Allen team, to join Alliant and/or encouraged them to take up Alliant employment in breach of the Pera Agreement and Separation Agreement.

118.    WTW knows that Pera, for example, reached out to one current WTW-SE employee and offered to "share [his] logic on the decision," by which he was presumably referring to his decision to join Alliant. On information and belief, Pera attempted to initiate that conversation for the purpose of soliciting the employee and/or encouraging them to leave their employment at WTW-SE.

119.    In addition to the Individual Defendants, another Pennsylvania-based WTW risk adjuster named Kanita Anjou ("Anjou") announced her resignation in close proximity to the Individual Defendants. Anjou is and has been a very valued member of WTW-SE. On information and belief, Anjou is likewise going to work for Alliant.

120.    On information and belief, Alliant has provided substantial assistance and encouragement to Pera in connection with these solicitation efforts with the goal to poach WTW's valued employees, and then poach the customers with whom the employees worked.

121.    Moreover, on information and belief, Pera has used confidential information relating to WTW employees for the purpose of soliciting their employment, and/or disclosed such information to Alliant in connection with its hiring of the other Individual Defendants.

**E.    The Individual Defendants Terminate Their Employment in Unison for Positions at Alliant.**

122.    The first domino to fall in WTW's Southeast Region was Kay, who resigned her employment with WTW-SE (and its predecessors(s)) of more than 20 years on August 2, 2023, around the same time Pera is believed to have begun working for Alliant. According to her LinkedIn profile, Kay began working for Alliant as a Senior Vice President in September 2023.

123.    Although Kay was resident in WTW's Potomac, Maryland office, throughout her employment, she frequently did business and attended meetings in Virginia, and knew each of the other Individual Defendants based out of Glen Allen office as a result of their mutual employment with WTW.

124.    On information and belief, Kay assisted Pera in soliciting the remaining Individual Defendants over the course of the following weeks in early-September of 2023. WTW's investigation has reasonably identified that Alliant's solicitation efforts of the other Individual Defendants began at least in early-September 2023, because around this time the Individual Defendants became derelict in several of their duties to WTW (as described below), and sent themselves personal and professional documents demonstrating their looking for alternative employment. As merely one example, in early September Laux sent a copy of her California Insurance Broker license to her personal Gmail account, which she would have no reason to do unless she was submitting it to an alternative employer.

125.    The week of September 18, 2023, Alliant's broader scheme to raid WTW's Real Estate practice based in Glen Allen came to fruition when the remaining Individual Defendants began resigning.

126.    On September 18, 2023, Bucheger resigned from Willis Americas, effective immediately. He did this after having served only a few days of the 15-day notice period required by the Bucheger Agreement.

127.    Amazingly, prior to his departure, Bucheger asked his supervisor if he could work on a project for Alliant while he was still a Willis Americas employee with fiduciary obligations to the company. Willis Americas declined that request.

128.    Wyatt resigned on September 21, 2023, and Laux and Highlander resigned on September 22, 2023. In doing so, Wyatt failed to provide the 30-days' notice required by the Wyatt Agreement. Similarly, Laux failed to provide the 15-days' notice required by the Laux Agreement.

129.    Walters and Johnson resigned their employment with WTW-SE on October 4, 2023, about two weeks after Laux, Highlander and Wyatt's resignations. Walters and Johnson worked regularly with the other Individual Defendants and were a part of Laux's team at WTW-SE. Upon information and belief, Laux, Highlander and/or Wyatt encouraged and solicited Walters and Johnson to resign their employment with WTW-SE in favor of Alliant, in violation of each of their employee non-solicitation covenants.

130.    The coordinated departures of the Individual Defendants to Alliant, a direct competitor, is alone enough to reasonably conclude that the scheme was pre-planned while these employees were working for WTW.

131.    Alliant's participation in this scheme is readily apparent. No reasonable person could believe that these employees all independently decided to move to Alliant within days of

each other without Alliant being actively involved in their solicitation, either directly or indirectly through Pera, other of the Individual Defendants, or perhaps other agents.

## F.   **The Individual Defendants' Unlawful Conduct.**

132.   Virtually immediately after the Individual Defendants gave notice of the termination of their WTW employment, WTW discovered that they were contacting WTW customers.

133.   For example, WTW has discovered that Wyatt, Laux and Highlander called the Risk Manager for JBG Smith Properties together to let him know that they that they were leaving WTW-SE to go to Alliant.

134.   JBG Smith Properties is a client for which Wyatt, Laux and Highlander provided services while they were employed at WTW-SE.

135.   On information and belief, the Individual Defendants are soliciting WTW clients in violation of the non-solicitation provisions contained in their respective Employment Agreements, and Alliant is actively assisting and encouraging those solicitation efforts.

136.   WTW's investigation into the employees' sudden departure and solicitation efforts is ongoing; however, facts have come to light evidencing that the Individual Defendants are soliciting WTW's clients and/or legitimate prospects on behalf of Alliant.

### (a).   **Southern Management Companies.**

137.   Southern Management Companies ("SMC") was a client of WTW-SE, previously serviced by Wyatt, Laux and Kay. SMC's business earned WTW-SE close to $400,000 in revenues per year.

138.   In 2023, SMC issued a request for proposals ("RFP") seeking additional companies to bid and pitch against WTW-SE to earn SMC's insurance brokerage business. WTW-SE further participated in the RFP, and sought to defend its position earning SMC's business. As part of this

effort, Wyatt and Laux were invited to attend a final pitch meeting with SMC on September 7, 2023 to describe WTW-SE's proposal.

139.    Notwithstanding the importance of maintaining SMC's business with WTW-SE, instead of attending the September 7, 2023 meeting and working to keep SMC's business, Wyatt and Laux failed to attend and completely blew off the opportunity at the last minute. Wyatt and Laux's actions in ignoring this important meeting with SMC amounted to a full dereliction of their duties. On information and belief, Wyatt and Laux decided it was in their best interest to miss this pitch meeting for WTW-SE.

140.    However, Wyatt's apparent disinterest to earn SMC's business on behalf of WTW-SE was not due to simple neglect. Rather, on September 20, 2023 (the day before he announced his resignation), Wyatt emailed to his personal Gmail account a copy of SMC's RFP. The RFP is marked CONFIDENTIAL and not for public dissemination. There is no legitimate reason why Wyatt would have emailed this document from his WTW e-mail account to his personal Gmail account, except to assist him and/or Alliant in soliciting this business to do business with Alliant, instead of WTW.

141.    SMC ultimately awarded their business to a different third-party (not Alliant), causing WTW to lose considerable future revenue and potential for renewals. On information and belief, now that Wyatt and Laux are Alliant employees, they plan to solicit the business of SMC.

    **(b).    Federal Realty Investment Trust.**

142.    On October 11, 2023, Federal Realty Investment Trust ("Federal Realty") terminated its relationship with WTW. Federal Realty exercised a ninety-day notice provision to initiate its exit from a Corporate Risk and Broking Services Agreement, but also issued broker of

record letters appointing Alliant as its exclusive broker of record, effective immediately. Going forward, Alliant is now entitled to earn compensation from Federal Realty as its insurance broker.

143.    Federal Realty is estimated to have generated annual revenue for Willis Towers Watson approximately totaling $528,635.

144.    WTW was surprised at Federal Realty's departure. Willis Towers Watson had concluded renewing the Broking Services Agreement on October 1, 2023, and, at the time, Federal Realty's representative reached out to WTW to express her satisfaction with WTW. On October 11, 2023, Federal Realty's representative contacted WTW again. And again, she told WTW that Federal Realty could not thank Willis Towers Watson enough, with special consideration for a job well done to Melisa Dolan, a current WTW-SE employee. Federal Realty then informed WTW that it felt that it had developed a relationship with the prior team, felt it needed to remain involved with that team, and would be moving with them.

145.    The WTW-SE employees previously responsible for servicing Federal Realty, in other words, the prior team, included Wyatt, Laux, Highlander and Walters.

**(c).    JBG Smith Properties.**

146.    On October 11, 2023, JBG Smith Properties ("JBG") terminated its relationship with Willis Towers Watson. JBG exercised a sixty-day notice provision to initiate its exit from a Corporate Risk and Broking Services Agreement and appointed Alliant as its exclusive broker of record effective immediately.

147.    JBG is estimated to have generated annual revenue for Willis Towers Watson approximately totaling $973,772.

148.    WTW had no notice that it was at risk of losing JBG. The day before JBG issued its BOR letter, a leader of WTW had attended a three (3) hour meeting with a representative of

JBG. They discussed the contracted risk management team that would be assigned to the account and outstanding services to be provided to JBG. At no time did WTW's representative receive any indication that JBG was considering moving to Alliant.

149.    JBG's Risk Manager disclosed that Wyatt, Laux and Highlander called together to let him know that they that they were leaving WTW-SE.

150.    The WTW-SE employees previously responsible for servicing JBG included Wyatt, Highlander, and Kay.

**(d).    EYA, LLC.**

151.    On October 11, 2023, WTW lost business from EYA, LLC ("EYA") to Alliant. EYA appointed Alliant as its exclusive BOR for two (2) separate insurance policies. Previously, on September 27, 2023, EYA had appointed Alliant as its exclusive retail BOR for four (4) additional insurance policies.

152.    EYA is estimated to have generated annual revenue for WTW approximately totaling $260,631.

153.    The WTW-SE employees previously responsible for servicing EYA included Wyatt, Highlander, and Walters.

**(e).    Homes for America, Inc.**

154.    On October 11, 2023, WTW received notice from Homes for America, Inc. ("Homes for America") that it was appointing Alliant as the BOR for its account.

155.    On Friday, October 6, 2023, Homes for America's representative reached out to an employee of WTW via text message. Homes for America's representative candidly admitted that she was "having conversations with the old team" and wanted to finalize discussions with them before considering renewing with Willis Towers Watson.

156.    Attached herein as **Exhibit K** is an image of the October 6, 2023 text message correspondence between the WTW employee and the Homes for America employee.

157.    The WTW-SE employees previously responsible for servicing Homes for America, in other words, the "old team," included Wyatt, Laux, and Kay.

158.    Homes for America is estimated to have generated annual revenue for Willis Towers Watson approximately totaling $291,486.

**(f).    Scott+Scott Attorneys at Law, LLP.**

159.    On October 11, 2023, WTW received notice from Scott + Scott Attorneys at Law, LLP ("Scott+Scott") that it was appointing an Alliant affiliated company as the broker of record for its account.

160.    Scott+Scott is estimated to have generated annual revenue for Willis Towers Watson approximately totaling $98,666.

161.    The WTW-SE employees previously responsible for servicing Scott+Scott, an international law firm, included Wyatt and Walker.

162.    Although Scott+Scott did not explain its move to Alliant, upon information and belief, Scott+Scott's managing partner is Wyatt's neighbor.

**(g).    Johnson's Misappropriation of WTW's Confidential Information.**

163.    While employed by WTW-SE, Johnson reported directly to Laux and was part of the servicing team for her accounts.

164.    The WTW computer system requires dual-factor authorization. To log into the system, a user is required to enter their password. A prompt will then appear to upload an authorization code on another device. Once that code is received and entered, the user is logged into the system.

165.    WTW uses a software management platform known as EPIC. The EPIC platform is where WTW stores information about its clients such as insurance policies, billing information, client histories, claims information and more. The EPIC system allows employees to pull up data and information and create reports on clients such as claims information, policy expiration dates and policy numbers, carrier information and much more.

166.    For clients for which the employee has responsibility, many reports are automatically already generated for the clients the employee is handling. For clients in the region that the employee is not handling, the employee is required to take additional steps to generate client reports.

167.    On **Sunday, October 1, 2023 at 8:00 a.m.**, Johnson logged into the WTW computer system using the required dual-factor authorization.

168.    After logging onto the system, Johnson proceeded to generate a query through EPIC to generate two reports on clients that she did not handle including, Federal Realty Investment Trust. Redacted copies of these reports are attached as **Exhibits L & M**. After generating the reports, Johnson sent herself two separate emails, each one containing a report. The subject matter of her emails to herself was "Real Estate Expiration List." Those emails were accessible on her mobile telephone.

169.    The reports that Johnson created include the following information: Lookup Code for the Clients, Account Names, Expiration Dates, Line Type Codes, Description of Policies, Names of the Producer, Account Executive and Account Manager, Main Policy Numbers and Line Status Code. This information is considered to be confidential and proprietary. The reports generated by Johnson contained information on clients Federal Realty Investment Trust, JBG Smith Properties, Sere Ventures, LLC, and Gem Management.

170.    On information and belief, once Johnson emailed the reports to herself they became accessible to her outside of WTW's protected computers systems, including through her mobile phone. Once the documents were taken outside of this protected system, she would be able to download, print or disseminate them to other parties (including Alliant) without WTW being able to trace the transfer of information or further protect its confidential and proprietary information.

171.    On October 11, 2023, WTW SE received broker of record letters from Federal Realty Investment Trust and JBG Smith Properties, advising insurance carriers that their insurance brokerage was being transferred from WTW-SE to Alliant. The BOR letters contained policy numbers. On information and belief, Alliant and the Individual Defendants used information from the Real Estate Expiration Reports that Johnson misappropriated to generate the BOR letters.

### G.    Alliant's History of Unfair Business Practices.

172.    On information and belief, Alliant had and has actual knowledge that Individual Defendants are bound by restrictive covenants that prohibit them from soliciting certain clients and employees, and prohibit them from using or disclosing confidential information.

173.    Alliant would be acutely aware of this information as a result of employing Pera, who was leader of WTW's Southeast Region and very familiar with its use of restrictive covenants.

174.    Alliant is also aware of such contractual restrictions from multiple cases that have arisen during the past several years in which Alliant was sued by WTW-SE for poaching employees and clients. *See, e.g.*, *Willis Towers Watson Southeast, Inc. v. Alliant Insurance Services, Inc.*, Case No. 22-00277 (W.D.N.C. 2022); *Willis Towers Watson Southeast, Inc. v. Alliant Insurance Services, Inc.*, Case No. 21-00417 (W.D.N.C. 2021); *Willis Towers Watson Southeast, Inc. v. Alliant Insurance Services. Inc.*, Case No. 202982-1 (Knox Cty. Tenn. Chancery Ct. 2021).

175.    Indeed, Alliant has a past history of raiding competitors' offices, and Alliant's intention here, too, is to unfairly compete by harming WTW-SE's Glen Allen office and Real Estate practice.

176.    This scheme is in keeping with Alliant's growth strategy of targeting producers with books of business and teams from competitors, resulting in a string of lawsuits against Alliant for such corporate raids.[4]

177.    Indeed, AssuredPartners of South Carolina, LLC and AssuredPartners Capital, Inc. commenced an action in the United States District Court for the District of South Carolina as recently as September 22, 2023, alleging that Alliant hired several employees who immediately began soliciting plaintiffs' customers. *See AssuredPartners of South Carolina, LLC, et al. v. Alliant Ins. Servs., Inc., et al.*, Civil File No. 23-04751 (D.S.C. 2023).

178.    As detailed above, WTW expended considerable time, effort, and resources developing and marketing its products and services and cultivating its relationships with its employees and its clients and prospective clients.

179.    The Individual Defendants each had access to valuable confidential and proprietary information that belonged exclusively to WTW-SE, Willis Americas and/or Willis Towers Watson.

---

[4] *See e.g., Arthur J. Gallagher & Co. v. Tarantino, et al.,* Case No. 3:20-cv-05505-JCS (N.D. Cal. 2020); *Mountain West Series of Lockton Cos., LLC et al. v. Alliant Insurance Services, Inc.*, Case No. 2019-0226-JTL (Del. Ch. Ct. 2019); *Corporate Synergies Group, LLC v. Andrews*, Case No. 2:18-cv-13381 (D.N.J. 2018); *Wells Fargo Ins. Servs. v. Alliant Ins. Servs.*, Case No. 2017-0540-JTL (Del. Ch. 2017), *Hays Group, Inc. v. Peters*, 0:16-cv-02352 (D. Minn. 2016); *Aon PLC v. Heffernan*, Case No. 1:16-cv-1924 (N.D. Ill. 2016); *Regions Ins. Inc. v. Alliant Ins. Servs.*, Case No. 3:13-cv-00667 (S.D. Miss. 2013); *Cook Maran & Assocs., Inc., v. Scrocca*, Case No. C-209-17 (N.J. Sup. Ct. 2017); *Wells Fargo Ins. Servs. v. Alliant Ins. Servs.*, Case No. 2017-0540-JTL (Del Ch. 2017); *Aon Risk Servs., N.E. v. Cusack*, 34 Misc. 3d 1205(A) (N.Y. Sup. Ct. December 20, 2011).

180.    The Individual Defendants are bound by enforceable restrictive covenants that prohibit solicitation of, acceptance of business from and providing services to certain clients and prospective clients. The covenants also prohibit the solicitation of employees.

181.    These restrictive covenants do not prohibit the Individual Defendants from working for competitors like Alliant. Rather, they are narrowly tailored to protect WTW's legitimate business interests and only prevent the Individual Defendants from soliciting, accepting business from, or servicing those clients and prospective clients with whom they had material business contact for a reasonable time period prior to the termination of their employment.

182.    Further, WTW's covenants are reasonably necessary to permit WTW to rebuild and reestablish client servicing teams in the places of those now former employees, which involves new hiring and/or retraining of existing personnel, and which takes years to properly accomplish. The Glen Allen practice, including the Real Estate practice, was built over the course of decades. A three- or two-year restriction, as the Employment Agreement at issue may have it, is necessary for WTW-SE and Willis Americas to fairly compete, rebuild and reestablish client relationships without interference after the loss of the employees servicing its client accounts.

183.    Consistent with industry practice, both WTW and Alliant require employees to enter into employment agreements that contain restrictive covenant obligations. These provisions are designed to ensure an orderly transition before and after the employee departs, thereby protecting the employer's client relationships.

184.    The Defendants, acting in concert with each other, have chosen to deliberately and intentionally ignore these contractual obligations.

185.    As a result of the raid, WTW-SE has to date lost at least one important producer, four client-facing employees, and a broker who serviced WTW clients.

186.    WTW-SE seeks to enjoin Alliant and the Individual Defendants from further interference with its client relationships and employees. WTW also seeks to recover direct and consequential damages, including lost profits and disgorgement of ill-begotten gains, and attorneys' fees that it has suffered as a result of the Defendants' unlawful conduct.

187.    If Defendants are permitted to solicit, accept business from and/or service any restricted clients or prospects as prohibited by the restrictive covenants, WTW will be irreparably harmed.

188.    Unless the Individual Defendants are enjoined from violating their restrictive covenant obligations for their contractually agreed upon two- or three-year periods, WTW will be deprived of the critical transition period during which it is assured of continuing to provide services to its clients without interruption by the Individual Defendants, all of whom have already begun working for a direct competitor. This would cause irreparable damage to WTW-SE's relationships with its clients and would almost certainly cause it to lose its client relationships.

189.    In the absence of a temporary injunction, followed by a permanent injunction, the damage to WTW's business and the loss of client goodwill, which WTW has built through the expenditure of substantial effort and expense as detailed above, would be incalculable. WTW stands to not only lose clients to a competitor, but also lose referrals from existing clients, which could have drastic and irreparable consequences for WTW's operations in the Richmond area and D.C. metro area.

190.    These unlawful acts will also result in the tarnishing of WTW's longstanding image of dependability, stability and client service dating back decades in Virginia, along with the loss of client confidence, the loss of talent to a competitor, and the loss of office stability and morale.

191.    The continuing threat of irreparable harm can only be remedied by issuance of injunctive relief to protect WTW's legitimate business interests.

192.    There is no adequate remedy at law to compensate WTW for the harm that it has incurred and will continue to incur as a result of Defendants' unlawful conduct.

193.    An injunction requiring the Defendants to honor the terms of the Individual Defendants' Agreements serves to maintain the status quo by preventing further breach.

194.    Should the Individual Defendants further breach their restrictive covenants, WTW will suffer additional harm that is incapable of being measured solely in terms of monetary damages, as it will be impossible to calculate the injurious effects of Defendants' conduct upon WTW's future lost profits.

195.    Should the Court refuse to enforce the narrowly tailored restrictive covenant obligations designed to protect WTW's legitimate interests in its confidential information and goodwill, it will send a message to competitors that they can induce employees to disregard common law and contractually agreed obligations with impunity. It will also send a message to similarly situated employees that they can receive consideration in exchange for covenants and obligations under Virginia law, be supported in their business development efforts on behalf of their employer to develop relationships with clients and prospects, yet leave suddenly and disregard their contractual obligations by soliciting clients, prospects and employees. As a result, the investments undertaken by WTW to gain a competitive edge in a highly competitive industry will be lost forever.

196.    The threat of irreparable harm that occurs when former employees violate WTW's restrictive covenants is further demonstrated through declarations that Pera himself has submitted

in connection with motions for injunctive relief on WTW's behalf. True and correct copies of examples are attached hereto as **Exhibits N & O**.

<u>**FIRST CAUSE OF ACTION**</u>
**Breach of Contract Against Pera (Willis Americas v. Pera)**

197.    WTW repeats and realleges paragraphs 1 through 196 of the Complaint as if fully set forth herein.

198.    The Pera Agreement is a valid and binding contract between Pera and Willis Americas, formed by an offer, acceptance of that offer and the presence of adequate consideration.

199.    The Pera Separation Agreement is a valid and binding contract between Pera and Willis Americas, formed by an offer, acceptance of that offer and the presence of adequate consideration.

200.    Willis Americas performed any condition precedent to the extent required under the Pera Agreement and Pera Separation Agreement.

201.    On information and belief, Pera breached the Pera Agreement by:

   a.    On information and belief, taking, using and/or disclosing confidential information of Willis Americas and/or other of the Willis Towers Watson companies;

   b.    On information and belief, soliciting Restricted Clients and/or Restricted Prospects in violation of Section 3 of the Pera Agreement; and

   c.    On information and belief, soliciting Protected Employees as defined in Section 3 of the Pera Agreement.

202.    On information and belief, Pera breached the Separation Agreement by:

   a.    On information and belief, violating his acknowledged, preexisting restrictive covenants with Willis Americas;

   b.    On information and belief, soliciting Restricted Clients and/or Restricted Prospects in violation of the Pera Separation Agreement;

   c.    On information and belief, soliciting employees of Willis Americas and/or other of the Willis Towers Watson companies; and

    d.   On information and belief, violating the implied covenant of good faith and fair dealing by negotiating the Separation Agreement with the knowledge that he planned to take up competitive employment.

203.    As a direct and proximate result of Pera's breaches of the Pera Agreement and Separation Agreement, as described herein, Willis Americas has suffered and will continue to suffer irreparable harm and loss, and has sustained damages, including without limitation loss of revenue, valuable business, profits, employee morale and goodwill, in an amount to be determined at trial. Furthermore, Willis Americas seeks disgorgement of monies paid to Pera under the Separation Agreement. Damages are ongoing and continue unabated at the time of the filing of this Complaint, thus necessitating the imposition of preliminary and permanent injunctive relief.

## SECOND CAUSE OF ACTION
### Breach of Contract Against Wyatt (WTW-SE v. Wyatt)

204.    WTW repeats and realleges paragraphs 1 through 196 of this Complaint as if fully set forth herein.

205.    The Wyatt Agreement is a valid and binding contract between Wyatt and HRH, formed by an offer, acceptance of that offer and the presence of adequate consideration. WTW-SE is a successor to HRH with the full legal authority and right to enforce the obligations contained in the Wyatt Agreement.

206.    WTW-SE performed any condition precedent to the extent required under the Wyatt Agreement.

207.    On information and belief, Wyatt breached the Wyatt Agreement by:

    a.   Failing to provide thirty (30) days' notice prior to terminating his employment;

    b.   On information and belief, taking, using and/or disclosing confidential information of WTW-SE and/or other of the Willis Towers Watson companies;

    c.  On information and belief, soliciting and/or servicing Customers and/or Prospective Customers in violation of Section 5 of the Wyatt Agreement; and/or

    d.  On information and belief, soliciting employees of WTW-SE and/or other of the Willis Towers Watson companies.

208.    As a direct and proximate result of Wyatt's breaches of the Wyatt Agreement, as described herein, WTW-SE has suffered and will continue to suffer irreparable harm and loss, and has sustained damages, including without limitation loss of revenue, valuable business, profits, employee morale and goodwill, in an amount to be determined at trial. Damages are ongoing and continue unabated at the time of the filing of this Complaint, thus necessitating the imposition of preliminary and permanent injunctive relief.

**THIRD CAUSE OF ACTION**
**Breach of Contract Against Laux (WTW-SE v. Laux)**

209.    WTW repeats and realleges paragraphs 1 through 196 of the Complaint as if fully set forth herein.

210.    The Laux Agreement is a valid and binding contract between Laux and WTW-SE, formed by an offer, acceptance of that offer and the presence of adequate consideration. The Laux Agreement provides that should Laux be reassigned to another Willis Towers Watson company, the Agreement shall be automatically assigned to such new employer. As Laux's most recent Willis Towers Watson company employer, WTW-SE has the full legal authority and right to enforce the obligations contained in the Laux Agreement.

211.    WTW-SE performed any condition precedent to the extent required under the Laux Agreement.

212.    On information and belief, Laux breached the Laux Agreement by:

    a.  Failing to provide fifteen (15) days' notice prior to terminating her employment;

    b.    On information and belief, taking, using and/or disclosing confidential information of WTW-SE and/or other of the Willis Towers Watson companies;

    c.    On information and belief, soliciting and/or servicing Restricted Clients and/or Restricted Prospects in violation of Sections 5 and 6 of the Laux Agreement; and/or

    d.    On information and belief, soliciting employees of WTW-SE and/or other of the Willis Towers Watson companies.

213.    As a direct and proximate result of Laux's breaches of the Laux Agreement, as described herein, WTW-SE has suffered and will continue to suffer irreparable harm and loss, and has sustained damages, including without limitation loss of revenue, valuable business, profits, employee morale and goodwill, in an amount to be determined at trial. Damages are ongoing and continue unabated at the time of the filing of this Complaint, thus necessitating the imposition of preliminary and permanent injunctive relief.

<u>**FOURTH CAUSE OF ACTION**</u>
**Breach of Contract Against Highlander (WTW-SE v. Highlander)**

214.    WTW repeats and realleges paragraphs 1 through 196 of the Complaint as if fully set forth herein.

215.    The Highlander Agreement is a valid and binding contract between Highlander and HRH, formed by an offer, acceptance of that offer and the presence of adequate consideration. WTW-SE is a successor to HRH with the full legal authority and right to enforce the obligations contained in the Highlander Agreement.

216.    WTW-SE performed any condition precedent to the extent required under the Highlander Agreement.

217.    On information and belief, Highlander breached the Highlander Agreement by:

    a.    On information and belief, taking, using and/or disclosing confidential information of WTW-SE and/or other of the Willis Towers Watson companies; and

      b.  On information and belief, soliciting and/or servicing Customers or Area Customers in violation of Section 1 of the Highlander Agreement.

218.    As a direct and proximate result of Highlander's breaches of the Highlander Agreement, as described herein, WTW-SE has suffered and will continue to suffer irreparable harm and loss, and has sustained damages, including without limitation loss of revenue, valuable business, profits, employee morale and goodwill, in an amount to be determined at trial. Damages are ongoing and continue unabated at the time of the filing of this Complaint, thus necessitating the imposition of preliminary and permanent injunctive relief.

### FIFTH CAUSE OF ACTION
**Breach of Contract Against Bucheger (Willis Americas v. Bucheger)**

219.    WTW repeats and realleges paragraphs 1 through 196 of the Complaint as if fully set forth herein.

220.    The Bucheger Agreement is a valid and binding contract between Bucheger and Willis Americas, formed by an offer, acceptance of that offer and the presence of adequate consideration.

221.    Willis Americas performed any condition precedent to the extent required under the Bucheger Agreement.

222.    On information and belief, Bucheger breached the Bucheger Agreement by:

      a.  Failing to provide fifteen (15) days' notice prior to terminating his employment;

      b.  On information and belief, taking, using and/or disclosing confidential information of Willis Americas and/or other of the Willis Towers Watson companies;

      c.  On information and belief, soliciting employees of Willis Americas, WTW-SE and/or other of the Willis Towers Watson companies.

223.    As a direct and proximate result of Bucheger's breaches of the Bucheger Agreement, as described herein, Willis Americas has suffered and will continue to suffer

irreparable harm and loss, and has sustained damages, including without limitation loss of revenue, valuable business, profits, employee morale and goodwill, in an amount to be determined at trial. Damages are ongoing and continue unabated at the time of the filing of this Complaint, thus necessitating the imposition of preliminary and permanent injunctive relief.

## SIXTH CAUSE OF ACTION
### Breach of Contract Against Walters (WTW-SE v. Walters)

224.    WTW repeats and realleges paragraphs 1 through 196 of the Complaint as if fully set forth herein.

225.    The Walters Agreement is a valid and binding contract between Walters and WTW-SE, formed by an offer, acceptance of that offer and the presence of adequate consideration.

226.    WTW-SE performed any condition precedent to the extent required under the Walters Agreement.

227.    On information and belief, Walters breached the Walters Agreement by:

   a.   Failing to provide fifteen (15) days' notice prior to terminating her employment;

   b.   On information and belief, taking, using and/or disclosing confidential information of WTW-SE and/or other of the Willis Towers Watson companies;

   c.   On information and belief, soliciting employees of WTW-SE and/or other of the Willis Towers Watson companies.

228.    As a direct and proximate result of Walters' breaches of the Walters Agreement, as described herein, WTW-SE has suffered and will continue to suffer irreparable harm and loss, and has sustained damages, including without limitation loss of revenue, valuable business, profits, employee morale and goodwill, in an amount to be determined at trial. Damages are ongoing and continue unabated at the time of the filing of this Complaint, thus necessitating the imposition of preliminary and permanent injunctive relief.

## SEVENTH CAUSE OF ACTION

## Breach of Contract Against Kay (WTW-SE v. Kay)

229.    WTW repeats and realleges paragraphs 1 through 196 of the Complaint as if fully set forth herein.

230.    The Kay Agreement is a valid and binding contract between Kay and WTW-SE, formed by an offer, acceptance of that offer and the presence of adequate consideration.

231.    WTW-SE performed any condition precedent to the extent required under the Kay Agreement.

232.    On information and belief, Kay breached the Kay Agreement by:

    a.    Failing to provide fifteen (15) days' notice prior to terminating her employment;

    b.    On information and belief, taking, using and/or disclosing confidential information of WTW-SE and/or other of the Willis Towers Watson companies;

    c.    On information and belief, soliciting and/or servicing Restricted Clients and/or Restricted Prospects in violation of Sections 5 and 6 of the Kay Agreement; and/or

    d.    On information and belief, soliciting employees of WTW-SE and/or other of the Willis Towers Watson companies.

233.    As a direct and proximate result of Kay's breaches of the Kay Agreement, as described herein, WTW-SE has suffered and will continue to suffer irreparable harm and loss, and has sustained damages, including without limitation loss of revenue, valuable business, profits, employee morale and goodwill, in an amount to be determined at trial. Damages are ongoing and continue unabated at the time of the filing of this Complaint, thus necessitating the imposition of preliminary and permanent injunctive relief.

## EIGHTH CAUSE OF ACTION
### Tortious Interference with Contract Against Alliant (WTW-SE and Willis Americas v. Alliant)

234.    WTW repeats and realleges paragraphs 1 through 196 of the Complaint as if fully set forth herein.

235.   WTW-SE has valid contractual relationships with Wyatt, Laux, Highlander, Walters and Kay in light of the Employment Agreements between the parties.

236.   Willis Americas has valid contractual relationships with Bucheger and Pera in light of the Employment Agreements between the parties, and in light of the Separation Agreement between Willis Americas and Pera.

237.   Alliant has actual and constructive knowledge of the Employment Agreements and the Separation Agreement, and of WTW-SE's and Willis Americas' reasonable expectation that the Individual Defendants will not violate those Agreements.

238.   Despite this knowledge, on information and belief, Alliant has aided, abetted, induced, encouraged and assisted the Individual Defendants to breach their contractual obligations to WTW-SE/Willis Americas.

239.   On information and belief, Alliant induced, encouraged and/or solicited the Individual Defendants to recruit each other, and potentially other of WTW's employees, to leave their employment in favor of Alliant.

240.   On information and belief, Alliant has permitted, induced and/or encouraged the Individual Defendants to solicit, accept business from and/or provide services to WTW clients in violation of the Individual Defendants' Employment Agreements, and in violation of the Separation Agreement.

241.   On information and belief, Alliant has permitted, induced and/or encouraged the Individual Defendants to use confidential and proprietary information of WTW in connection with their Alliant employment, and Alliant has knowingly benefitted from same.

242.    Alliant was in no way privileged or legally justified to interfere with WTW-SE's Employment Agreements or with Willis Americas' Employment Agreements or Separation Agreement.

243.    As a result of Alliant's unlawful conduct, the Individual Defendants have breached their contractual obligations to WTW-SE/Willis Americas.

244.    As a direct and proximate result of Alliant's tortious interference with the Employment Agreements and the Separation Agreement, as described herein, Willis Americas and WTW-SE have each suffered and will continue to suffer irreparable harm and loss, and have sustained damages, including without limitation loss of revenue, valuable business, profits, employee morale and goodwill, in an amount to be determined at trial. Damages are ongoing and continue unabated at the time of the filing of this Complaint, thus necessitating the imposition of preliminary and permanent injunctive relief.

## NINTH CAUSE OF ACTION
**Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 (WTW-SE v. Johnson)**

245.    WTW repeats and realleges paragraphs 1 through 196 of the Complaint as if fully set forth herein.

246.    WTW-SE has developed and possesses trade secrets directly related to and used in connection with its brokerage services, which are provided throughout the country.

247.    WTW-SE has developed its trade secrets over the course of many years and through the expenditure of considerable time, effort, resources, and at substantial expense and investment. WTW-SE's trade secrets have been developed through, among other things, data gathered from clients and information, data, and agreements between WTW and its clients.

248.    WTW-SE's trade secrets are of independent economic value by providing WTW an actual or potential business advantage over its competitors who do not know or have access to

the information and who could obtain economic value from the disclosure or use of WTW-SE's trade secrets.

249.    WTW-SE has taken a variety of reasonable steps to protect the secrecy and confidentiality of its trade secrets. These steps include but are not limited to storing data in a fashion that only employees may access utilizing dual-factor authentication, and limiting employees' access to information only to those with a need to know such information. Moreover, WTW-SE has written policies prohibiting the use and disclosure of confidential information.

250.    WTW-SE had provided Johnson access to its trade secrets solely as a result of her position with WTW-SE and servicing its clients. Johnson knew that WTW-SE's trade secrets to which she was given access are highly valuable to WTW-SE, are not available to WTW-SE's competitors, and would be of value to WTW-SE's competitors such as Alliant if such trade secrets were disclosed to and used by them or Johnson outside of her employment with WTW-SE. Johnson had a duty to maintain the secrecy of WTW-SE's trade secrets pursuant to her common law duty of loyalty and WTW-SE's policies concerning the confidentiality of information.

251.    Johnson willfully and with an unlawful intent misappropriated WTW-SE's trade secrets by accessing WTW-SE's EPIC system and e-mailing herself the confidential data and information outside of WTW's protected system for the benefit of herself, Alliant and/or the other Individual Defendants.

252.    Upon information and belief, Johnson has used and disclosed and/or intends to use and disclose the misappropriated trade secrets in competition with WTW-SE.

253.    As a direct result of Johnson's misappropriation of WTW-SE's trade secrets, WTW-SE has suffered and will continue to suffer irreparable harm, lost prospective economic advantage, loss of current and potential customers and vendors, lost revenue, and expenses.

254. WTW-SE will continue to be irreparably harmed if Johnson were allowed to service the very same clients for which she stole confidential and proprietary information. Accordingly, the Court should order that Johnson be enjoined from servicing or participating in any business matters concerning or relating to those clients whose information she misappropriated.

255. Johnson's misappropriation of WTW-SE's trade secrets was willful and malicious, thereby entitling WTW-SE to an award of exemplary damages, as well as attorneys' fees.

## TENTH CAUSE OF ACTION
### Breach of the Duty of Loyalty (WTW-SE v. Wyatt and Laux)

256. WTW repeats and realleges paragraphs 1 through 196 of the Complaint as if fully set forth herein.

257. As a result of their employment with WTW-SE, Wyatt and Laux each owed a common law duty of loyalty to WTW-SE to act in the company's best interest and to not compete against WTW-SE during the course of their employment.

258. On information and belief, Wyatt and Laux breached their respective duties by, among other things, purposely and deliberately abandoning their efforts to win the RFP for SMC by failing to show up for the September 7, 2023 meeting where they were to present WTW-SE's proposal to keep SMC's business.

259. It is evident from the fact that Wyatt emailed the SMC RFP to his personal Gmail account immediately prior to his resignation, that Wyatt's true intention was not to keep this business for WTW-SE, but to instead win this business on behalf of his soon-to-be employer, Alliant.

260. As a result of Wyatt and Laux's breaches of their common law duties of loyalty, WTW-SE has suffered monetary damages in an amount to be proved at trial, including but not limited to lost SMC revenues.

**WHEREFORE**, WTW respectfully requests that the Court:

1.      Following a hearing, enter a preliminary injunction, followed by a permanent injunction, enjoining Individual Defendants from directly or indirectly, whether alone or in concert of with others, including with any owner, partner, shareholder, officer, agent, employee, and/or representative of Alliant, as follows:

a.      For a period of three (3) years, enjoining Wyatt and Highlander from soliciting or performing services for clients or prospective clients in a manner that is prohibited by their respective Employment Agreement(s);

b.      For a period of two (2) years, enjoining Laux, Bucheger, Pera, Walters and Kay from soliciting or performing services for clients or prospective clients in a manner that is prohibited by their respective Employment Agreements and/or, in the case of Pera, by his Separation Agreement;

c.      For a period of six (6) months, enjoining Wyatt from soliciting Willis Americas' employees, or those of any other Willis Towers Watson company, in a manner that is prohibited by the Wyatt Agreement;

d.      For a period of two (2) years, enjoining Laux, Bucheger, Pera, Walters and Kay from soliciting WTW employees, or those of any other Willis Towers Watson company, in a manner that is prohibited by their respective Employment Agreements;

e.      Enjoining Individual Defendants from using, disclosing or transmitting for any purpose, including the solicitation of clients or employees, any of WTW-SE's or Willis Americas' confidential information, as defined in the Individual Defendants' respective Employment Agreements; and

f.      Enjoining Defendants from destroying, erasing or otherwise making unavailable for further proceedings in this matter any records or documents (including data or information maintained in computer media) in Defendants' possession or control which was obtained from or contains non-public information derived from any records of Willis Towers Watson companies, including but not limited to confidential information of WTW-SE and/or Willis Americas;

2.      Order Defendants to return to WTW's counsel any and all records or information pertaining to Willis Towers Watson companies' confidential and proprietary information, including trade secrets, whether in the original, copies, computerized, handwritten or any other form, and purge such information from Defendants' possession, custody or control within 24 hours of notice to Defendants or their counsel of the terms of the Court's Order; provided, however, that any information so purged shall be printed and saved to a computer disk or similarly accessible and readable recording device prior to purging and be returned to WTW pursuant to this paragraph;

3.      Require Pera to disgorge any benefits that he received pursuant to the Settlement Agreement in light of his subsequent violation of his restrictive covenants;

4.      Grant such other and further equitable relief necessary to bring Defendants into full and complete compliance and conformance with the contractual obligations of Individual Defendants under their respective Employment Agreements;

5.      Enter judgment in WTW's favor against Defendants for compensatory damages including direct and consequential damages, punitive damages, and attorneys' fees and costs, as provided for by law in an amount to be determined as trial;

6.      Award pre- and post-judgment interest as provided by law; and

7.      Grant such other and further relief as the Court deems just and proper.

## **DEMAND FOR A JURY TRIAL**

WTW demands a trial by jury on the claims and issues that are so triable.

Respectfully submitted,

Dated: <u>October 12, 2023</u>

/s/ Robert L. Duston
Robert L. Duston (VA Bar No. 23888)
Nicole E. Chammas (VA Bar No. 94701)
SAUL EWING LLP
1919 Pennsylvania Avenue, NW, Suite 550
Washington, DC 20006
(202) 338-8800
(202) 337-6065 (Facsimile)
rob.duston@saul.com
nicole.chammas@saul.com

Gary B. Eidelman (*pro hac vice* to be filed)
Erik P. Pramschufer (*pro hac vice* to be filed)
SAUL EWING LLP
1001 Fleet Street, 9th Floor
Baltimore, MD 21202
(410) 332-8975
(410) 332-8862 (Facsimile)
gary.eidelman@saul.com
erik.pramschufer@saul.com

*Counsel for Plaintiffs*

## VERIFICATION

I, Nancy Korcinsky,  Southeast Geography and Corporate and Risk and Broking Leader of Plaintiff Willis Americas Administration, Inc., a corporate affiliate of Plaintiff Willis Towers Watson Southeast, Inc. (collectively, "Plaintiffs"), verify that I am authorized to make this verification on behalf of Plaintiffs: (i) I have read the foregoing Verified Complaint, and the facts alleged therein are true and correct to the best of my knowledge and belief; (ii) there is no single person employed or otherwise connected with Plaintiffs who has personal knowledge of all the facts and information set forth in the Verified Complaint; (iii) that said Verified Complaint was prepared with the assistance and advice of counsel and the assistance of various employees and representatives of Plaintiffs and their affiliates, upon which I have relied; (iv) that subject to inadvertent or undiscovered errors, the Verified Complaint is based on Plaintiffs' knowledge and belief which is necessarily limited by the records and information still in existence, presently recollected and thus far discovered in the course of the preparation of the Verified Complaint; (v) that Plaintiffs reserve the right to amend the Verified Complaint if it appears at any time that omissions or errors have been made or that more accurate information is available; and (vi) that subject to these limitations, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 12th day of October 2023.


Nancy Korcinsky